UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ED MERKNER, *et al.*,
    Plaintiffs,

vs.

AK STEEL CORPORATION,
    Defendant.

Case No.: 1:09-cv-423

Magistrate Judge Timothy S. Black

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR ENTRY OF PRELIMINARY INJUNCTION AGAINST DEFENDANT**

According to Plaintiffs, the men and women who worked for the steel company were promised that when they retired from working for the company, it would continue to pay for their health insurance for free for the rest of their lives. Allegedly, the steel company negotiated lower salaries for workers in consideration of the promise to provide retirees with free heath insurance for life. According to Plaintiffs, everyone knew of the promise, and the company met the promise for years and years, at great expense. One day, though, the company and the union of the then-current workers looked at their written collective bargaining agreement, and, pursuant to it, announced that the company was going to reduce drastically its payments for retirees' health insurance. Alas, the promise of free health insurance to retirees for life was expressed ambiguously in the written agreement, and the company read it to say that free insurance would continue except as the company and the union may otherwise agree. And one day, the company and the union agreed to reduce benefits for the retirees (who were no longer members of the union). The retirees cried foul, and came to the Court to enforce the alleged promise of free heath insurance for life.

## Procedural Posture

This case is a civil action brought as a putative class action by three retirees of AK Steel Corporation seeking, *inter alia*, preliminary injunctive relief preventing AK Steel from reducing further its current payment level for subsidized retiree medical and welfare benefits. Plaintiffs have filed a motion for Preliminary Injunction (Doc. 24), and AK Steel has fully briefed its opposition (Doc. 38). Plaintiffs have also filed a motion for partial summary judgment (Doc. 15), and the parties have filed responsive memoranda (Docs. 37, 39). Defendant has also filed its own motion for summary judgment (Doc. 9), to which Plaintiffs have responded (Doc. 16). The Court heard oral argument on 12/8/09.

The Court today **GRANTS** Plaintiffs' motion and enters a Preliminary Injunction prohibiting Defendant from effecting any further benefit reductions or new charges relating to the retiree medical/welfare benefits as currently subsidized, both for the three named Plaintiffs and for all members of a prospective class of Butler Plant hourly retirees, until entry of final judgment in this case.

## Analysis

In determining whether or not to grant injunctive relief, the trial court must balance and weigh the following factors:

(1) the plaintiffs' likelihood of success on the merits;

(2) the existence of irreparable harm to the plaintiffs in the absence of an injunction;

(3) whether others will be harmed if an injunction is issued; and

(4) the public's interest in issuing an injunction.[1]

---

[1] *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997).

These factors are not prerequisites to issuing an injunction but factors to be balanced.[2] The Court, however, should not issue a preliminary injunction where there is no likelihood of success on the merits.[3]

1. <u>Plaintiffs' Likelihood of Success on the Merits</u>

Retiree insurance benefits are welfare benefit plans under ERISA.[4] ERISA does not require that retiree insurance benefits be vested but such benefits may be vested if the parties agree to vesting.[5] Whether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties.[6]

The basic principles of contract interpretation are appropriate for determining the parties' intent in collective bargaining agreements.[7] The Court should first look to the explicit language of the collective bargaining agreement for clear manifestation of intent.[8] The Court should also look to the context which gave rise to the inclusion of the clause being interpreted and should interpret each provision in question as part of the integrated

---

[2] *Unsecured Creditors of DeLorean Motor Co. v. DeLorean,*, 755 F.2d 1223, 1229 (6th Cir. 1997).

[3] *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997).

[4] *Mauer v. Joy Techs., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000).

[5] *Int'l Union, United Auto v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983).

[6] *Yard-Man, Inc.*, 716 F.2d at 1479 (citing *John Wiley & Sons v. Livingston*, 376 U.S. 543, 555 (1964)). See also *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 555 (2006); *CNH America v. Yolton*, 127 S. Ct. 554 (2006).

[7] *Yard-Man, Inc.*, 716 F.2d at 1479.

[8] *Id.* (citing *Kellogg Co. v. NLRB*, 457 F.2d 519, 524 (6th Cir. 1972)).

whole while considering the relative positions and purposes of the parties.[9] The terms of the collective bargaining agreement shall be construed so as to render none nugatory and to avoid illusory promises.[10] Where ambiguities do exist, the Court may consider other words and phrases in the collective bargaining agreement for guidance.[11] The Court should also review the interpretation ultimately derived from its examination of the language and other indicia of intent for consistency with federal labor policy.[12]

Since at least the 1960s, AK Steel has entered into collective bargaining agreements ("CBAs") with the unions which have represented its workers, which CBAs have provided a health care and life insurance benefit plan for active and retired employees. This insurance benefit plan was incorporated into the CBAs by reference. These plans provided retirees, and their surviving spouses and dependents, with medical, prescription drug, dental, vision, and life insurance benefits at no cost.

Prior to 1993, the insurance article of the CBAs contained a termination clause. However, the clause was silent with regard to retirees who had retired during the term of the agreement. Nevertheless, in *Bailey v. AK Steel Corporation*,[13] this Court held in a

---

[9] *Yard-Man, Inc.* 716 F.2d at 1479. *See also Kellogg Co.*, 457 F.2d at 524; *Florida Canada Corp. v. Union Carbide & Carbon Corp.*, 280 F.2d 193 (6th Cir. 1960).

[10] *Yard-Man, Inc.*, 716 F.2d at 1480.

[11] *Id.*

[12] *Id.*

[13] *Bailey v. AK Steel Corp.*, No. 1:06cv468, 2006 U.S. Dist. LEXIS 68298 (S.D. Ohio Sept. 22, 2006).

preliminary injunction that the health welfare benefits of those who had retired during the existence of the CBA had vested at the time of their retirement, notwithstanding the termination clause.[14]

In 1993, AK Steel removed the termination clause to the insurance article of the collective bargaining agreement. However, AK Steel for the first time included a clause in the 1994 insurance benefit plan SPD, entitled "Continuation of Coverage." The Continuation of Coverage clause stated that the benefits provided according to the Plan:

> ". . . for any pensioner, individual receiving surviving spouse's benefit . . . shall not have such coverage terminated or reduced (except as provided in the eligible leave provisions of the Plan) so long as the individual remains retired from the Company, receives a Surviving Spouse's benefit or remains a Long Term Disability benefit recipient, notwithstanding the expiration of this Agreement, <u>except as the Company and the Union may agree otherwise</u>."[15]

---

[14] In *Bailey*, the CBA at issue incorporated by reference an "Insurance Benefits Plan." The Plan included insurance benefits for medical services, prescription drugs, dental, vision, Medicare subsidy, and life insurance, at virtually no cost to participants. AK Steel alleged that it had the right to terminate the Plan based on a termination clause that permitted termination of the Plan on 120 days written notice after expiration of the CBA. This Court compared this termination clause to a similar termination clause in *Yolton* and determined that the clause intended only to terminate the agreement, not the benefits created by it, which benefits had vested in those who had retired during the term of the CBA. This Court further determined that the finding of an intent for retiree benefits to vest upon retirement served to clarify the Insurance Article of the CBA: *i.e.*, to the end that the right to terminate health insurance benefits was applicable to active employees only, not to retirees for whom benefits had vested upon retirement. Moreover, this Court in *Bailey* also found other indicia of intent for retiree benefits to vest upon retirement, just as are found in the present case: like *Bailey*, the plan at issue here links eligibility for the plan to eligibility for pension benefits, which pension rights are undoubtedly vested; and, like *Bailey*, the plan at issue here provides coverage after one's death; and, like *Bailey*, the plan at issue here provides supplemental coverage to Medicare Plan B, even if a retiree retires at age 55. Thus, as in *Bailey*, the only way to read the Plan without rendering numerous provisions nugatory is that the Continuation of Coverage clause here, like the termination clause in *Bailey*, gave the company the right to modify the Plan only with respect to active employees, and certainly not to retirees whose benefits had vested upon retirement.

[15] October 1, 1993 Settlement Agreement between Armco, Inc. and Butler Armco Independent Union entitled "Continuation of Coverage" at Appendix E, pg. 3 (emphasis supplied) (Doc. 15, Ex. 6).

Thus, the question presented is whether this provision allows the company to reduce the benefits of retirees, if vested, if the union of the current workers consents.

After a grievance from a retiree over the continuation of coverage clause was filed, the Company, through the writing of its Human Resources Director, Michael Seyler, clarified the clause, stating:

> "The Company will not terminate or reduce the coverage and/or benefits of these plans so long as the individual pensioner remains retired from the Company or the surviving spouse continues to receive and/or to be entitled to receive a surviving spouses pension and/or welfare benefit."[16]

The 1996 CBA contained minor revisions of the insurance article, but the changes were of little to no effect. The Plan contained the same coverage as a set forth in the 1994 SBD describing the insurance benefits plan. Additionally, in October 1996, the company and the union jointly compiled a booklet of memorandums or letters of agreement and other documents which were intended to carry forward in all subsequent negotiations. The corresponding 1996 Settlement Agreement referenced the October 1, 1993 letter from Mr. Seyler of AK Steel confirming that benefits for retirees would not be terminated or reduced.

The company issued a SPD of the amended plan on January 1, 1997. However, the amended plan contained no changes to the eligibility provisions of the insurance benefit plan, the costs of benefits clause, or the continuation of coverage clause of the policy.

---

[16] October 1, 1993 letter to Arthur Stanfield, President of Butler Armco Independent Union, from Michael Seyler, Human Resources Manager (Doc. 15, Ex. 19).

The 2001 CBA maintained the same insurance article as was found in the 1996 CBA. The Plan contained the same coverages as was described in the 1993 and 1996 CBAs describing the Insurance Benefits Plan II. No termination clause existed in the insurance article. Like the agreements in 1993 and 1996, the corresponding 2001 Settlement Agreement references the October 1, 1993 letter from Mr. Seyler for the company providing that benefits for retirees would not be terminated or reduced.

In 2002, the company issued a revised SPD which had no effect on the Plaintiffs' benefits.

In 2003, the BEIU merged with the United Auto Workers Union. Three years later, in 2006, the company and the new union agreed to an entirely new health insurance agreement, including substantial reductions in the benefits of retirees.

Thus, the 2006 CBA insurance article now reads:

> "Effective October 1, 2006, all employees will participate in the Insurance Benefits Plan <u>III</u> for active employees, which contains the insurance and benefits set forth in the Insurance Benefits Plan II <u>as modified by the parties</u>."[17]

Accordingly, on January 1, 2007, the company implemented extensive changes to the insurance plan coverage, offering options which were substantially inferior to the vested benefits to which Plaintiffs were entitled under the plan, and eliminating or significantly reducing vested lifetime benefits to which Plaintiffs were entitled. These changes included: termination of dental and vision coverage, termination of the Medicare

---

[17] October 1, 2006 CBA Insurance Articles (emphasis supplied) (Doc. 15, Ex. 4).

Part B premium reimbursement of $1,200 per year, and the elimination of life insurance coverage. In addition, the 2006 Settlement Agreement included many additional reductions to the Plaintiffs' health care benefits that are to occur effective February 1, 2010. As of that time, the company's contributions for the Plaintiffs' benefits are capped at the company's maximum contribution for the year 2009, and the retirees will be required to pay the remaining amounts to continue their coverage. It is these reductions in benefits that the Plaintiffs ask the Court to enjoin, plus the reductions effected in 2007.

ERISA allows a participant to bring a lawsuit to recover benefits due under the terms of his plan, to enforce rights under the terms of the plan, and/or to clarify the right to future benefits.[18] If Plaintiffs establish that the benefits promised them under the plan vested, so that AK Steel could not withdraw them, the benefits would continue without reduction until their death and their spouses'.[19]

ERISA divides benefits into two categories: pension plans and welfare plans. Plans which provide medical benefits, such as the one covering Plaintiffs here, are welfare benefit plans under 29 U.S.C. § 1002. Under ERISA, a promise or agreement by an employer for vested welfare benefits will be enforced.[20]

If the benefits are vested, they cannot be reduced without consent.[21] Consent cannot be given by a union on behalf of retirees and surviving spouses.[22]

---

[18] 29 U.S.C. § 1132(a)(1)(B).

[19] *Deboard v. Sunshine Min. & Refining Co.*, 208 F.3d 1228, 1238 (10th Cir. 2000).

[20] *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1069 (6th Cir. 2008).

[21] *Id.*

[22] *Bailey*, 2006 U.S. Dist. LEXIS 68298, at *8.

Retirees and surviving spouses must agree before their vested benefits can be reduced, notwithstanding subsequent agreements between their former union and former employer.[23]

Since 1993, the collective bargaining agreements at issue between the company and the union have explicitly allowed changes to benefits "as the company and the union may agree." The question presented to the Court is, therefore, whether or not health insurance benefits vested for retirees upon retirement, precluding any reduction thereafter, even with the consent of the then-current employees' union.

The seminal case in the Sixth Circuit regarding the vesting of welfare benefits is *UAW v. Yardman*.[24] Pursuant to *Yardman*, when the language of the document is ambiguous, the Court shall consider extrinsic evidence of the parties' intent as to whether or not retiree benefits vest upon retirement.[25] When contextual factors indicate an intent to vest welfare benefits, *Yardman* creates an inference: "Retiree benefits are in a sense "status" benefits, which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained."[26]

Here, an examination of the parties' intent reveals the preliminary conclusion that retirees health benefits vested when they retired. Under the collective bargaining

---

[23] *Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass*, 404 U.S. 157, 181 n.20 (1971); *Yard-Man*, 716 F.2d 1476 at 1482, n.8 (6th Cir. 1983) (citing *Allied Chem.*, 404 U.S. at 181, n. 20; *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 918 (6th Cir. 2000)).

[24] *Yard-Man*, 716 F.2d at 1476.

[25] *Id.* at 1480.

[26] *Id.* at 1482. *See also Yolton*, 425 F.3d at 579-580.

agreement, any reductions in benefits, even if agreed to by the company and the union, could apply only to active employees and not to those who had already retired. As the Sixth Circuit stated in *Yolton*: "Retirees, who have left their bargaining unit, and could no longer rely on their union to maintain their benefits, are not likely to leave their benefits alterable based on the changing whims and relative bargaining power of their former union and employer."[27] Instead, as the Sixth Circuit holds in *Yolton*, "the retirement package available to someone contemplating retirement will change with the expiration and adoption of CBAs, but someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself."[28]

Here, the termination clause was removed from the CBAs beginning in the 1993 CBA. The language of the CBAs and the SPDs show intent to vest, and the language promising that retiree benefits begin at the time of retirement and shall be continued thereafter, coupled with the tying of retiree benefit health benefits to pension status, reflects intent for lifetime health benefits to vest upon retirement.[29]

Accordingly, Plaintiffs evidence likelihood of success on the merits sufficient to establish that this factor weighs in favor of issuing a preliminary injunction.

---

[27] *Yolton*, 435 F.3d at 581, n.6.

[28] *Id.* at 581.

[29] *See* footnote 14, *supra* at p. 5.

## 2. Irreparable Harm to Plaintiffs

The law appears well-settled that Plaintiffs may obtain a preliminary injunction to protect their access to medical care during the pendency of litigation if they evidence irreparable harm.[30] Injury non-compensable in terms of money damages constitutes irreparable injury.[31] Here, the impending and substantial increases in out-of-pocket expenses for medical insurance coverage, coupled with the elimination of the Medicaid Part B premium reimbursement, will result in decreases in medical care, the rationing of other necessities of life, and an increased uncertainty and anxiety rising to the level of irreparable injury.[32] The reduction in or denial of medical treatment and services at a time in life when it is critical to Plaintiffs' welfare exacerbates the harm. The uncertainty and worry of not knowing the full extent of their prospective health expenses under the newly reduced plan would cause a worry and uncertainty that could not be compensated.[33]

---

[30] *See Bailey*, 2006 U.S. Dist. LEXIS 68298. *See also Helwig v. Kelsey-Hayes Co.*, 857 F.Supp. 1168, 1179 (E.D. Mich. 1994) *aff'd*, 93 F.3d 243 (6th Cir. 1996); *Golden v. Kelsey-Hayes Co.*, 845 F.Supp. 410 (E.D. Mich. 1994) *aff'd* 763 F.3d 648 (6th Cir. 1996); *Hinckley v. Kelsey-Hayes Co.*, 866 F.Supp. 1034 (E.D. Mich. 1994); *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48 (2d Cir. 2004); *Warner v. Ryobi Motor Prods. Corp.*, 818 F.Supp. 907, 908-09 (D.S.C. 1992); *Schalk v. Teledyne*, 751 F.Supp. 1261 (W.D. Mich. 1990).

[31] *LaForest*, 376 F.3d at 56. *See also Schalk*, 751 F.Supp. 1261 (retirees' access to Medicare irrelevant to finding of irreparable harm where plaintiffs would suffer increase in out-of-pocket expenses, resulting in possible decrease in care, lack of other necessities of life, and increased uncertainty and anxiety); *Warner*, 818 F.Supp. at 908-09 (finding irreparable harm since if the company's actions are allowed many retirees would be "completely without health insurance coverage other than Medicare . . . Plaintiffs would be denied needed medical treatment and services at a time when the same is critical to Plaintiffs' welfare.").

[32] *See Helwig*, 857 F.Supp. at 1179; *Golden*, 845 F.Supp. 410; *Hinckley*, 866 F.Supp. 1034; *Schalk*, 751 F.Supp. at 1261.

[33] *Schalk*, 751 F.Supp. at 1267-68.

Forcing retirees to choose between needed medical procedures and paying for basic necessities is the sort of irreparable injury specifically contemplated by the remedy of preliminary injunctive relief.[34]

Plaintiffs have sufficiently evidenced the existence of irreparable harm to them in the absence of an injunction such that this factor weights in favor of granting a preliminary injunction.

### 3. Harm to Others

In balancing the hardships to the retirees versus to the steel company, the Court finds easily that the balance of hardships tips decidedly in favor of the retirees.[35] The Company has paid the full cost of the retirees' benefits for many, many years, and, therefore, as the Sixth Circuit found in *Yolton*, "the financial impact on Defendants being required to continue to pay these benefits [pending determination of a final judgment] is far less than the financial burden that would be placed on Plaintiffs if their request for a preliminary injunction is denied."[36]

Plaintiffs have sufficiently evidenced that the balancing of the hardships favors entry of a preliminary injunction.

---

[34] *Helwig*, 857 F.Supp. at 1179.

[35] *Bailey*, 2006 U.S. Dist. LEXIS 68298 at 35.

[36] *Yolton*, 318 F.Supp. at 473.

### 4. The Public's Interest

The public interest is reflected in ERISA's purpose to protect the interests and expectations of the rights of employees and retirees guaranteed by welfare benefit plans. ERISA provides that the policy behind it is "to protect the interests of participants in employee benefit plans . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans . . . by providing for appropriate remedies, sanctions, and ready access to the Federal Court." 29 U.S.C. §1001(b). As one court has stated: "The public interest lies in protecting the legitimate expectations of retirees that their health insurance will be provided for the rest of their lives."[37]

At this preliminary stage, the Court finds that the public interest weighs in favor granting a preliminary injunction.

### 5. No Bond

A district court must expressly consider the question of requiring a bond before issuing a preliminary injunction.[38] The amount of the security required and whether a bond is required is within the discretion of the district court.[39] Here, based on the circumstances of the case, including the ages and financial means of the retirees, the public interest, the balancing of the hardship favoring Plaintiffs, and the Plaintiffs'

---

[37] *Helwig*, 857 F.Supp. at 1181 (*citing Schalk*, 751 F.Supp. at 1268).

[38] *Roth v. Bank of the Commonwealth*, 583 F.2d 527 (6th Cir. 1978).

[39] *Id.* at 539.

likelihood of success on the merits, the Court orders that the injunction issue without bond.

WHEREFORE, for good cause shown, Plaintiffs' Motion for Preliminary Injunction is **GRANTED** and Defendant AK Steel Corporation is hereby **ORDERED** to effect no further benefit reductions or new charges relating to retiree medical/welfare benefits as currently subsidized, both for the three named Plaintiffs and for all members of a prospective class of Butler Plant hourly retirees,[40] until entry of final judgment in this case.

**IT IS SO ORDERED.**

Date: January 29, 2010

*Timothy S. Black*
Timothy S. Black
United States Magistrate Judge

---

[40] *Bailey*, 2006 U.S. Dist. LEXIS 68298 at 32 (citing *Yolton*, 318 F. Supp.2d at 472; *Helwig v. Kelsey-Hayes Co.*, 857 F. Supp. 1168, 1180 (E.D. Mich 1994) *aff'd*, 93 F.3d 243 (6th Cir. 1996)) (the court will take into consideration the irreparable harm faced by putative class members before certification because of the nature of injunctive relief at this stage of the litigation).