## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ED MERKNER, THOMAS E.   )
RODGERS, PETER E. CONNOR,  )
JACK KRIESS and ED MUSKO,  )
on behalf of themselves and others  )
similarly situated,       )
            )
       **Plaintiffs,**  )
**vs.**            )
            )
            )
AK STEEL CORPORATION,   )
            )
       **Defendant.**  )

CASE NO. 1:09-CV-423-TSB

CLASS ACTION

## DECLARATION OF MONA LISA WALLACE, ESQ. IN SUPPORT OF PLAINTIFFS' MOTION FOR AWARD OF ATTORNEY FEES AND EXPENSES

I, Mona Lisa Wallace, hereby declare under penalty of perjury the following is true and correct:

1. My name is Mona Lisa Wallace. I am over the age of eighteen (18). I have personal knowledge of the facts stated herein, and am fully competent to make the statements set forth below. I am one of the attorneys for Plaintiffs in the above-captioned matter.

## A. Personal Qualifications.

2. I have been a lawyer representing consumers and victims for over 30 years. During that time, I, and my law firm, Wallace & Graham, P.A., have represented clients in the areas of civil litigation, workers compensation, general and premises liability, insurance coverage, consumer protection, ERISA, LMRA, medical monitoring, consumer fraud, fair debt collection practices, predatory lending, personal injury, mass and toxic torts and products liability including asbestos, silica, radiation, chemical poisonings, prescription drugs, and other similar occupational and product related claims. These claims and matters have often involved mass and/or class claims.

3. I attended the University of North Carolina at Chapel Hill for my undergraduate education. I was a National Merit Scholar, and received a Bachelor of Arts Degree with Honors in 1976.

4. I attended Wake Forest University School of Law for my postgraduate education, and received a Juris Doctor Degree with Honors in 1979.

5. Since 1979 I have been engaged in the private practice of law in Salisbury, North Carolina, concentrating in civil litigation.

6. My professional affiliations, licenses and memberships include: North Carolina State Bar; South Carolina State Bar; Texas State Bar; Tennessee State Bar; Pennsylvania State Bar; United States District Courts for the Western, Eastern & Middle Districts of North Carolina; United States Supreme Court; South Carolina Supreme Court; United States District Court for the District of South Carolina; and United States Court of Appeals for the Fourth Circuit, among others. Further, I have extensive experience practicing before other judicial and administrative tribunals and forums.

7. Much of my legal career has been focused on consumer, employee and retiree rights issues. I have had a long and active involvement in Public Justice. This organization is the United States' largest public interest law firm. I am the past President, a member of the Executive Committee, and a member of the Board of Directors of this organization. Public Justice is a national public interest law firm with offices in Washington, D.C. and Oakland, California. A volunteer network of more than 3,000 of the best trial lawyers in the United States, this organization in which I am most actively involved, is dedicated to accepting and litigating cases that involve the public good. I have held various other positions including Public Justice Diversity Committee, Co-Chairman of the Program Development Committee, Case Development Committee, Co-Chairman

of the Major Donor/Special Gifts Committee, North Carolina State Coordinator, and Vice President of this organization.

8.     I have been active with the North Carolina State Bar, including as Former Advisory Member of the Rules of Professional Conduct Review Committee, Former Member of the Public Service and Information Committee, Former Member of the Family Law Committee. My other Professional Appointments have included appointment to the Wake Forest School of Law Board of Visitors, to the Catawba College Board of Trustees, and to the Hood Theological Seminary Board of Trustees.

9.     I am a member of the North Carolina Advocates for Justice. My involvement with this organization includes appointment to the Former Executive Committee for Workers' Compensation, to the Legislative Committee, and to the PAC (Political Action Committee) Trustee, and currently I am the chairperson of the Product Liability Section.

10.     I am a member of the Association of Trial Lawyers of America and the North Carolina Association of Women Attorneys. In 2006, I was presented the Ebbie Award.

11.     I am a member of the American Bar Association and the Association of Trial Lawyers of America (Patron). I am also a member of the ABA Task Force on Asbestos within the Tort Trial and Insurance Practice Section.

12.     I have been a speaker at Seminars and Conferences on legal issues throughout North Carolina.

13.     I have been actively involved in civic and charitable activities including my most recent appointment to the Raoul Wallenberg Committee of the United States, an organization dedicated to educating school children and prisoners about historical heroes. See my Curriculum Vitae attached as Exhibit A for additional qualifications.

3

**B.    Qualifications of the Law Firm.**

14.    Our firm has special expertise in representing clients in class action litigation.

15.    Other pending class action cases in which our law firm is lead counsel or actively involved co-counsel include:

a.  *George, et al. v. Duke Energy Retirement Cash Balance Plan, et al.*, Civ. No. 8:06-CV-373 (USDC, DSC) (class action claims arising under ERISA in regard to a pension plan);

b.  *Anthony, et al. v. Koch Industries, et al.*, Case No. 1:05CV00806 (USDC, MDNC) (class action claims arising under ERISA in regard to a retiree benefit plan);

c.  *Curtis, et al. v. Alcoa Inc.*, Civ. No. 3:06-CV-448 (USDC, EDTN) (mass and class action claims arising under ERISA in regard to retirement medical benefits);

d.  *Mills v. Hendrick*, Civ. No. 04 CVS 2301 (Union County Superior Court) (class action against car dealer chain);

e.  *Clark v. Alan Vester Auto Group*, Civ. No. 06 CVS 141 (Vance County Superior Court) (class action against car dealer chain);

f.  *Owens and Price v. Automobile Protection Corporation and Sonic Automotive, et al.*, class arbitration before the American Arbitration Association, Consolidated Case No. 30 459 00642 05 (unfair and deceptive finance and sales practices involving car dealer chain);

g.  *Murdock v. Rebate Cash Advance*, Civ. No. 06-CVS-1865 (Iredell County Superior Court) and AAA class arbitration (class action/arbitration against payday lender);

h.  *Kucan v. Advance America*, Civ. No. 04-CVS-2860 (New Hanover County Superior Court) (class action against payday lender);

i.  *Hager v. Check into Cash*, Civ. No. 04-CVS-2859 (New Hanover County Superior Court) (same);

j.  *McQuillan v. Check n Go*, Civ. No. 04-CVS-2858 (New Hanover County Superior Court) (same);

k.  *Knox v. First Southern*, Civ. No. 05-CVS-0445 (New Hanover County Superior Court) (same);

l.  *Torrence v. Nationwide Budget,* Civ. No. 05-CVS-0447 (New Hanover County Superior Court) (same).

16.     Our firm has special expertise in representing clients in other complex litigation. Other past or pending complex litigation in which our law firm is or was lead counsel or actively involved co-counsel include:   mass tort claims against Weyerhaeuser, Alcoa, Duke Energy, Fieldcrest Cannon, and other large corporations; representation of thousands in occupational disease, mass tort, and/or medical monitoring cases and claims; and litigation of numerous complex occupational disease cases in other States with local co-counsel.

17.     My law firm is experienced in and capable of administering and processing large groups of claims and ongoing lawsuits, and has settled and continues to settle claims and cases for large groups of employees and retirees on a regular basis.  My firm has had extensive experience in handling large number of claimants in complex litigation and class action litigation.

18.     Our law firm's associates who assisted on the case were also highly skilled and qualified, as are our firm's paralegals and staff who assisted.  Myself and the attorneys involved in this case have ability and experience in these matters and are reputable and qualified.  Our firm has an excellent reputation, particularly in the southeastern United States region.

**C.  Review of Relevant Factors with Regard to Fees and Costs.**

19.     Pursuant to case law and ethical rules, factors commonly evaluated in reviewing a fee application include (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the

experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. Applying each of those factors:

20. **The time and labor required** -- This case has taken a substantial amount of time and labor. There were numerous depositions, and drafting, discovery and briefing were all major undertakings.

21. Prior to filing the lawsuit, our law firm extensively researched the applicable law and facts. Significant work was put into drafting and preparing the Complaint, developing the factual and legal allegations and claims, and meeting and reviewing information from the original Plaintiffs prior to when we instituted this action by the filing of a Class Action Complaint.

22. Subsequently our firm incurred additional significant time and expense including but not limited to:

    a. Amending the Complaint under Rule 15 of the Federal Rules of Civil Procedure on two occasions;

    b. Evaluating Defendants' Answer and responding to Defendants' motion for summary judgment;

    c. Preparing and filing the Plaintiffs' motion for partial summary judgment and motion for preliminary injunction;

    d. Engaging in significant discovery including review of voluminous documents, the service of interrogatories and requests for production, the filing of a discovery motion and the attending of numerous depositions;

    e. Preparing for and attending hearings in this matter including with regard to the Defendants' motion for summary judgment, the Plaintiffs' motion for partial summary judgment and the Plaintiffs' motion for preliminary injunction;

    f. Attending numerous meetings and telephone calls with Plaintiffs and class members;

    g. Working on the Defendants' appeal of the order granting the preliminary injunction;

    h. Working with experts/consultants on complex valuation and damages-related issues;

    i. Working on negotiating the settlement, participating in multiple mediation sessions, researching settlement issues, drafting settlement documents, assisting with the class notice process, and meeting with large groups of class members;

j. Preparing and filing Plaintiffs' motion to certify this matter as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure as well as the motion for certification of a settlement class and for the second amendment of the Complaint as part of the initial settlement process; and

k. Otherwise incurring significant fees and expenses in regard to the successful prosecution of this substantial Class Action over the years of its pendency.

23. In short, my firm incurred significant fees and expenses with regard to all stages and work activities necessary for this matter to be litigated, including pre-lawsuit research, discovery of and a thorough review and analysis of thousands of pages of documents, the taking of relevant depositions, research and analysis of the law, motion practice, discovery disputes, and related activities naturally required in order to actively litigate the subject claims.

24. As of December 10, 2010, our firm's total number of hours to date based on our records is estimated to be in excess of 1,440.1 hours, inclusive of 1,225.4 attorney hours and 214.7 staff hours.

25. For purposes of the instant submission, our firm carefully reviewed rates sought and allowed in comparable cases involving retiree benefit class actions in the Sixth Circuit for lodestar analysis. Our firm would respectfully request application of rates for purposes of the instant submission of $475/hour for myself and William M. Graham, as we are the partners of the firm each with 20-plus years of experience; $450/hour for Mr. Schwaba and Mr. Hughes, each of whom was very qualified in complex litigation and each having 10-plus years of experience; $200/hour for Mr. Goss, who has J.D. and M.B.A. degrees though less experience; and a rate of $100/hour for our paralegals and specialized staff. The hourly rates used in this calculation do not include charges for expense items. Expense items are billed separately and such charges are not duplicated in the firm's billing rates.

26. The total "lodestar" amount for work performed to date, accordingly, applying the above figures with regard to hours incurred and hourly rates ranging from $100 to $475/hour is

$576,967.50. Should the Court wish to review the hundreds of pages of time records, Class Counsel will submit those records for *in camera* review (these records contain information that is protected by the attorney-client and work product privileges).

27.     In addition, we anticipate additional work on the matter to meet with clients, work on the VEBA trust, and otherwise assist with implementing the settlement through the next several years. This time commitment is likely to be substantial and between our firm and our co-counsel's law firm is estimated to consume upward of 1000 additional hours. Assuming our firm does half of the work (500 hours) and applying an average rate of $400/hour for lodestar purposes, the total estimated lodestar for future work comes to an additional $200,000.

28.     In addition, our law firm advanced significant unreimbursed expenses in this matter. These expenses are commercially reasonable and are reflected in the books and records of the firm and amount to approximately $159,503.79, which detailed cost records are likewise available for the Court's review upon its request.

29.     In addition, we expect to incur additional costs going forward with regard to assisting the Plaintiffs and Class Members with the VEBA trust, visiting and meeting with the clients, and so forth.

30.     Under the "Laffey Matrix," which is a noted authority for fee-setting including in the Sixth Circuit, the current hourly rates for attorneys such as myself, Mr. Coleman and Mr. Graham would be as high a $709/hour, for Mr. Schwaba and Mr. Hughes over $500/hour, and for paralegals over $160/hour, based on the version of the Laffey Matrix available at www.laffeymatrix.com, a copy of which is attached hereto as Exhibit B along with another version of the Laffey Matrix available at http://www.justice.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_7.html.

31.     Courts have stated that it may be relevant to review the hourly rates charged by defense firms during the relevant times. Here, during 2008, for example, the North Carolina-based law firm of Moore & Van Allen charged up to $770/hour according to the National Law Journal 2008 sample, while the North Carolina-based law firm of Womble Carlyle charged up to $750/hour according to the sample. (Exhibit C). Mr. Hughes used to work for those two defense firms in complex litigation prior to working at Wallace and Graham.

32.     The Baker Donelson law firm based in Tennessee charged up to $525/hour and the Bass, Berry & Sims law firm based in Tennessee charged up to $575/hour in 2008. (Id.). Co-Counsel Mr. Coleman is based in Tennessee.

33.     The Frost Brown Todd firm in Ohio charged up to $490/hour, the Roetzel & Andress firm charged up to $500/hour, Shumaker, Loop & Kendrick charged up to $500/hour, and Thompson Hine charged up to $740/hour, in 2008. (Id.). All of these firms are located within this Court's venue of Ohio.

34.     On February 5, 2010, The Honorable John O. Craig, III, North Carolina Special Superior Court Judge, approved our law firm's fee petition in the *Hendrick* class action which used hourly rates ranging up to $475/hour. (See Order, and Wallace Affidavit, from *Hendrick* matter, attached as Exhibit D).

35.     On September 7, 2007, The Honorable William L. Osteen, United States District Judge for the Middle District of North Carolina, approved our law firm's fee petition in the *Kosa* class action which used hourly rates ranging up to $495/hour. Further, in that action we submitted a supporting Declaration of Gary V. Mauney, Esq. reflecting that the market rate for qualified ERISA counsel in the Charlotte, NC area exceeded $450/hour as of the year 2007. (See Order, Wallace Declaration and Mauney Declaration, from *Kosa* matter, attached as Exhibit E).

36.     **The novelty and difficulty of the questions involved** – The case involved certain complex factual and legal issues. This may be evidenced by the complexity of the legal arguments made in the briefs that have been filed. The complexity of the case and evolving nature of the law required Class counsel to monitor other active cases during the pendency of this case, and to perform regular searches of Westlaw and PACER so as to monitor ongoing developments in the case law. The unsettled nature of the law increased the risk of the case.

37.     **Skill requisite to perform the legal services; preclusion of other employment** -- This case required dedicated work by attorneys, paralegals, and staff of our office. The work took diligence and skill. Attorneys and staff of our office were precluded or limited in regard to taking on other matters as a result of the time commitments of this case. Attorneys were precluded from taking on or restricted in their ability to participate in certain other matters as a result of the time commitments of this case.

38.     **The fee customarily charged in the locality for similar legal services** – As discussed in the supporting brief and as discussed above, Plaintiffs have applied rates for purposes of this case which are in line with rates approved by the Courts in the Sixth Circuit in other similar cases and in line with hourly rates charged by defense law firms and rates previously approved in cases in which our law firm was counsel.

39.     **The time limitations imposed by the client or by the circumstances** – As reflected in the history of the case, challenging time limitations were at times imposed by the circumstances, thereby requiring harder or faster work.

40.     **The nature and length of the professional relationship with the client** – The firm has worked closely with the Class Representative Plaintiffs and expended time and expenses in communicating, meeting with, and defending at deposition, said Plaintiffs.

41.     **Whether the fee is fixed or contingent** – The case was taken on a contingent fee basis thereby supporting an increased fee in light of the risk to the firm. The risk to our firm was increased because our firm accepted the case under a contingent fee basis without requiring any retainer, deposit or hourly payment from our clients, at any time, whatsoever. Accordingly, our law firm bore a substantial financial risk in the event the case had failed.

42.     Under the terms of the original retainer agreements with the Plaintiffs and Class Representatives, our firm agreed to take this case under a 25% contingent fee. However, we have agreed to reduce our original 25% contingent fee agreement with the Plaintiffs down to a 10% fee. Further, we have agreed to seek only 10% of the gross cash amount obtained for the hourly and salaried class of $91,000,000, and no percentage of the benefit of AK Steel continuing to pay benefits for class members through December 31, 2014 which is significant. Accordingly, the attorneys' fees and costs requested are $9,100,000 (10% of the gross cash portion of the settlement of $91,000,000), subject to Court approval.

43.     **The amount involved and the results obtained** – Class Counsel obtained an excellent result for the Class both with regard to the amount of recovery obtained and the results otherwise obtained.

44.     The Settlement reached by Class Counsel is an excellent recovery for the Class and include the following:

> a.  Continued health benefits until December 31, 2014 – Hourly Class. AK Steel is currently providing health benefits to hourly class members who are not Medicare-eligible, as well as class members who are Medicare eligible and will continue to do so at its expense at current respective levels and costs for hourly class members until December 31, 2014. The approximate value of this commitment to continue to pay benefits for hourly class members through December 31, 2014 is $84,000,000. This includes the value of benefits for 2010 which were increased because of the Preliminary Injunction issued by the Court in January of 2010.

b. Continued health benefits until December 31, 2014 – Salaried Class. AK Steel is currently providing health benefits to salaried class members who are not Medicare-eligible, as well as class members who are Medicare eligible and will continue to do so at its expense at current respective levels and costs for salaried class members until December 31, 2014. The approximate value of this commitment to continue to pay benefits for salaried class members through December 31, 2014 is $3,600,000.

c. VEBA for Benefits from January 1, 2015 Onward – Hourly Class. In addition to the continued benefits described above, AK Steel will make cash payments totaling a gross cash amount of $86,000,000, inclusive of payments to a "Voluntary Employees' Beneficiary Association" or "VEBA" ("a Common Fund") and payment of attorneys' fees and costs. The VEBA, which is a trust fund, will assume responsibility for providing health benefits to Hourly Class Members and their eligible dependents on January 1, 2015. This cash amount is in addition to the benefit of AK Steel continuing to pay benefits through December 31, 2014 which is approximately $84,000,000. The total value of the Hourly Class Settlement after payment of attorneys' fees and costs is approximately $161,400,000.

d. VEBA for Benefits from January 1, 2015 Onward – Salaried Class. In addition to the continued benefits described above, AK Steel will make cash payments totaling a gross cash amount of $5,000,000, inclusive of payments to the VEBA and payment of attorneys' fees and costs. The VEBA will assume responsibility for providing health benefits to Salaried Class Members and their eligible dependents on January 1, 2015. This cash amount is in addition to the benefit of AK Steel continuing to pay benefits for salaried class members through December 31, 2014 which is approximately $3,600,000. The total value of the Salaried Class Settlement after payment of attorneys' fees and costs is approximately $8,100,000.

45.     To date, only one individual to the undersigned's knowledge submitted an objection to the proposed class settlement, which objection was later withdrawn. Accordingly, to the undersigned's knowledge there are no pending objections at this time. In fact, the undersigned and the firm have been told by many class members that they support and are grateful for the settlement.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

**EXECUTED** this 20th day of December, 2010 in Salisbury, North Carolina.

MONA LISA WALLACE

12

# EXHIBIT A

*Mona Lisa Wallace*
*Curriculum Vitae*

## BIOGRAPHICAL DATA:

Date and Place of Birth:  November 14, 1954, Salisbury, NC
Address:  1101 Sumter Court, Salisbury, NC 28144
Telephone:  704.637.0088
Marital Status:  Married Leo Wallace III in 1976
Children:  Two daughters, Whitney, who also practices law at Wallace & Graham, and Lane, a Project Assistant with Sun Dance Power.

## PRESENT POSITION:

Senior Partner
Wallace and Graham, P.A.
525 North Main Street
Salisbury, NC 28144
704.633.5244

Areas of Practice:  Personal injury, workers' compensation, toxic torts and products liability including asbestos, silica, radiation, chemical poisonings, prescription drugs, and other similar occupational and product related claims.

## EDUCATION:

The University of North Carolina at Chapel Hill; Bachelor of Arts Degree with Honors, National Merit Scholar, 1976
Wake Forest University School of Law, Winston-Salem, NC; Juris Doctor Degree with Honors, 1979

## PROFESSIONAL AFFILIATIONS:

| | |
|---|---|
| Licensed in and Member of North Carolina State Bar | since 1979 |
| Licensed in and Member of South Carolina State Bar | since 1999 |
| Licensed in and Member of Pennsylvania State Bar | since 2009 |
| Licensed in and Member of Texas State Bar | since 2000 |
| Licensed in and Member of Tennessee State Bar | since 2009 |
| United States District Court, Western District | since 1998 |
| United States District Court, Eastern District | since 1998 |
| United States District Court, Middle District | since 1979 |
| United States District Court of North Carolina | since 1979 |

| | |
|---|---|
| United States District Court of South Carolina | since 1999 |
| United States Supreme Court | since 1998 |
| United States Supreme Court of North Carolina | since 1979 |
| United States Supreme Court of South Carolina | since 1999 |
| United States Supreme Court of Texas | since 2000 |
| United States Court of Appeals, Fourth Circuit | since 1991 |
| North Carolina Bar Association | since 1979 |
| North Carolina Advocates for Justice (NCAJ) | since 1979 |
| (Formerly known as: *North Carolina Academy of Trial Lawyers*) | |
| American Bar Association, Patron | since 2003 |
| Public Justice | since 1995 |
| (Formerly known as: *Trial Lawyers for Public Justice*) | |
| American Association for Justice (AAJ) | since 1985 |
| Southern Trial Lawyers Association (STLA) | since 2010 |

## *PROFESSIONAL APPOINTMENTS:*

North Carolina State Bar
    Former Advisory Member, Rules of Professional Conduct Review Committee
    Former Member, Public Service and Information Committee
    Former Member, Family Law Committee
Wake Forest School of Law, Board of Visitors
Catawba College, Board of Trustees
Public Justice
    President
    Executive Committee
    Board of Directors
    Diversity Committee
    Co-Chairman, Program Development Committee
    Case Development Committee
    Co-Chairman, Major Donor/Special Gifts Committee
    North Carolina State Coordinator
North Carolina Advocates for Justice – NCAJ (formerly: *North Carolina Academy of Trial Lawyers*)
    Board of Governors
    Section Chair of the Products Liability Section
    Membership Committee
    Co-Chairman, Product Liability Section
    PAC committee member
    Former Executive Committee, Workers' Compensation
    Legislative Committee
    Former PAC (Political Action Committee) Trustee
Association of Trial Lawyers of America
    Law Schools Committee
North Carolina Association of Women Attorneys

American Bar Association
   ABA Task Force on Asbestos within the Tort Trial and Insurance Practice
   Section
Raoul Wallenberg Committee of the US, Board of Directors
Workplace Injury Litigation Group
   2005-2006 Board of Directors
Workers Injury Law & Advocacy Group
   2005-2006 Board of Directors

Speaker at Seminars and Conferences on Legal Issues throughout the U.S.
   2010 – NCAJ Trial Lawyers – guest speaker at annual meeting held
      in Vancouver, Canada

Publications
   Proving & Defending Damage Claims; A Fifty State Guide; Co-Author of
   Chapter 7, State Consumer Protection Statutory Remedies

   Compensation Under A Trust-Fund Solution To Asbestos Claims: Is It
   Really Fair?; Co-Author

## CIVIC ACTIVITIES:

   Trustee, Catawba College
   Chairman, Catawba College Board of Visitors
   Former Member, Board of Trustees, Hood Theological Seminary, Livingstone
College
   North Carolina Transportation Museum, Board of Directors
   Chair, Ralph Ketner School of Business Advisory Council, Catawba College
   Co-Chair, Catawba School of Business
   Former Member, United Way Board of Directors
   Former Member, Tri-County Mental Health Board of Directors
   First Presbyterian Church
   Rowan Helping Ministries, Board Member, Executive Committee Member

## CHARITABLE FOUNDATIONS:

- Mona Lisa and Lee Wallace Foundation
- Rowan Helping Ministries (RHM)

## AWARDS:

- North Carolina Academy of Trial Lawyers; 2006 Ebbie Award
- The American Trial Lawyers Association; 2007 Top 100 Trial Lawyers Award
- Top 100 Trial Lawyers – North Carolina

# EXHIBIT B

# LAFFEY MATRIX

History

Case Law

Expert Opinion

Contact us

Home

Links

|  |  |  | Years Out of Law School * | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Year | Adjustmt Factor** | Paralegal/ Law Clerk | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
| 6/01/10- 5/31/11 | 1.0337 | $161 | $294 | $361 | $522 | $589 | $709 |
| 6/01/09- 5/31/10 | 1.0220 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08- 5/31/09 | 1.0399 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05- 5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04- 5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 |
| 6/1/03- 6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 |
| 6/1/02- 5/31/03 | 1.0727 | $118 | $217 | $267 | $385 | $434 | $522 |
| 6/1/01- 5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 |
| 6/1/00- 5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 |
| 6/1/99- 5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 |
| 6/1/98- 5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 |
| 6/1/97- 5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 |
| 6/1/96- 5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 |
| 6/1/95- 5/31/96 | 1.032 | $85 | $155 | $191 | $276 | $311 | $375 |
| 6/1/94- 5/31/95 | 1.0237 | $82 | $151 | $185 | $267 | $301 | $363 |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has been

approved in a number of cases. See, e.g., McDowell v. District of Columbia, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); Salazar v. Dist. of Col., 123 F.Supp.2d 8 (D.D.C. 2000).

* "Years Out of Law School" is calculated from June 1 of each year, when most law students graduate. "1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). "4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier "1-3" from June 1, 1996 until May 31, 1999, would move into tier "4-7" on June 1, 1999, and tier "8-10" on June 1, 2003.

** The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.



# UNITED STATES ATTORNEY'S OFFICE
## FOR THE DISTRICT OF COLUMBIA

555 4TH STREET, NW
WASHINGTON, DC 20530
(202) 514-7566

SEARCH

HOME

U.S. ATTORNEY

ABOUT US

DIVISIONS

COMMUNITY
PROSECUTION

PROGRAMS
FOR YOUTH

VICTIM WITNESS
ASSISTANCE

PARTNERSHIPS

PRESS RELEASES

EMPLOYMENT

ESPAÑOL

CONTACT US

LINKS

SITE MAP

## LAFFEY MATRIX 2003-2009

| Experience | 03-04 | 04-05 | 05-06 | 06-07 | 07-08 | 08-09 |
|---|---|---|---|---|---|---|
| 20+ years | 380 | 390 | 405 | 425 | 440 | 465 |
| 11-19 years | 335 | 345 | 360 | 375 | 390 | 410 |
| 8-10 years | 270 | 280 | 290 | 305 | 315 | 330 |
| 4-7 years | 220 | 225 | 235 | 245 | 255 | 270 |
| 1-3 years | 180 | 185 | 195 | 205 | 215 | 225 |
| Paralegals & Law Clerks | 105 | 110 | 115 | 120 | 125 | 130 |

Years (Rate for June 1 - May 31, based on prior year's CPI-U)

**Explanatory Notes**

1.  This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared by the Civil Division of the United States Attorney's Office for the District of Columbia. The matrix is intended to be used in cases in which a "fee-shifting" statute permits the prevailing party to recover "reasonable" attorney's fees. See, e.g., 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412 (b) (Equal Access to Justice Act). The matrix does not apply in cases in which the hourly rate is limited by statute. See 28 U.S.C. § 2412(d).

2.  This matrix is based on the hourly rates allowed by the District Court in Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354 (D.D.C. 1983), aff'd in part, rev'd in part on other grounds, 746 F.2d 4 (D.C. Cir. 1984), cert. denied, 472 U.S. 1021 (1985). It is commonly referred to by attorneys and federal judges in the District of Columbia as the "Laffey Matrix" or the "United States Attorney's Office Matrix." The column headed "Experience" refers to the years following the attorney's graduation from law school. The various "brackets" are intended to correspond to "junior associates" (1-3 years after law school graduation), "senior associates" (4-7 years), "experienced federal court litigators" (8-10 and 11-19 years), and "very experienced federal court litigators" (20 years or more). See Laffey, 572 F. Supp. at 371.

3.  The hourly rates approved by the District Court in Laffey were for work done principally in 1981-82. The Matrix begins with those rates. See Laffey, 572 F. Supp. at 371 (attorney rates) & 386 n.74 (paralegal and law clerk rate). The rates for subsequent yearly periods were determined by adding the change in the cost of living for the Washington, D.C. area to the applicable rate for the prior year, and then rounding to the nearest multiple of $5 (up if within $3 of the next multiple of $5). The result is subject to adjustment if appropriate to ensure that the relationship between the highest rate and the lower rates remains reasonably equal. Changes in the cost of living are measured by the Consumer Price Index for All Urban Consumers (CPI-U) for Washington-Baltimore, DC-MD-VA-WV, as announced by the Bureau of Labor Statistics for May of each year.

4.  Use of an updated Laffey Matrix was implicitly endorsed by the Court of Appeals in Save Our Cumberland Mountains v. Hodel, 857 F.2d 1516, 1525 (D.C. Cir. 1988) (en banc). The Court of Appeals subsequently stated that parties may rely on the updated Laffey Matrix prepared by the United States Attorney's Office as evidence of prevailing market rates for litigation counsel in the Washington, D.C. area. See Covington v. District of Columbia, 57 F.3d 1101, 1105 & n. 14, 1109 (D.C. Cir. 1995), cert. denied, 516 U.S. 1115 (1996). Lower federal courts in the District of Columbia have used this updated Laffey Matrix when determining whether fee awards under fee-shifting statutes are reasonable. See, e.g., Blackman v. District of Columbia, 59 F. Supp. 2d 37, 43 (D.D.C. 1999); Jefferson v. Milvets System Technology, Inc., 986 F. Supp. 6, 11 (D.D.C. 1997); Ralph Hoar & Associates v. Nat'l Highway Transportation Safety Admin., 985 F. Supp. 1, 9-10 n.3 (D.D.C. 1997); Martini v. Fed. Nat'l Mtg Ass'n, 977 F. Supp. 482, 485 n.2 (D.D.C. 1997); Park v. Howard University, 881 F. Supp. 653, 654 (D.D.C. 1995).

**Last Updated on
06/19/2008**

# EXHIBIT C

# THE NATIONAL LAW JOURNAL

Select 'Print' in your browser menu to print this document.

**Copyright 2009. Incisive Media US Properties, LLC. All rights reserved. National Law Journal Online**
Page printed from: http://www.nlj.com

Back to Article

## A nationwide sampling of law firm billing rates

December 08, 2008

The National Law Journal *asked the respondents to its 2008 survey of the nation's 250 largest law firms to provide a range of hourly billing rates for partners and associates. Firms that supplied this information — including some firms that are not in the NLJ 250 — are listed below in alphabetical order. We also asked firms to provide average and median billing rates, and several complied. The number after a firm's name indicates the total number of attorneys at the firm. The city listed after the name of a firm is the location of its principal or largest office.*

*The 2008 NLJ Billing Survey is available in downloadable Excel format from ALM Research.*

**Adams and Reese (253),** New Orleans
Partners $240-$425 (average $318, median $310)
Associates $175-$300 (average $209, median $205)
Firmwide (average $257, median $265)

**Arent Fox (336),** Washington
Partners $410-$710
Associates $260-$465

**Armstrong Teasdale (252),** St. Louis
Partners $295-$450
Associates $175-$300

**Baker, Donelson, Bearman, Caldwell & Berkowitz (549),** Memphis, Tenn.
Partners $230-$525 average $339, median $330)
Associates $120-$300 (average $218, median $220)
Firmwide (average $295, median $290)

**Balch & Bingham (244),** Birmingham, Ala.
Partners $295-$600
Associates $200-$280

**Bass, Berry & Sims (211),** Nashville, Tenn.
Partners $240-$575 (average $410, median $420)
Associates $175-$365 (average $245, median $240)
Firmwide (average $307, median $300)

**Best Best & Krieger (198),** Riverside, Calif.
Partners $300-$550 (average $391, median $375)
Associates $190-$330 (average $252, median $245)
Firmwide (average $340, median $305)

**Blank Rome (503),** Philadelphia
Partners $425-$785 (average $525)
Associates $245-$485 (average $332)
Firmwide (average $400)

**Bond, Schoeneck & King (189),** Syracuse, N.Y.
Partners $210-$450 (average $308, median $310)
Associates $150-$250 (average $187, median $185)
Firmwide (average $268, median $275)

**Bradley Arant Rose & White (255),** Birmingham, Ala.
Partners $260-$550
Associates $170-$310

**Briggs and Morgan (175),** Minneapolis
Partners $300-$580 (average $420, median $425)
Associates $195-$290 (average $229, median $225)
Firmwide (average $368, median $390)

**Brinks Hofer Gilson & Lione (171),** Chicago
Partners $320-$700 (average $499, median $500)
Associates $180-$435 (average $281, median $275)
Firmwide (average $392, median $390)

**Broad and Cassel (179),** Orlando, Fla.
Partners $290-$475 (average $378, median $375)
Associates $175-$320 (average $245, median $248)
Firmwide (average $314, median $310)

**Brownstein Hyatt Farber Schreck (235),** Denver
Partners $275-$750 (average $424, median $400)
Associates $160-$285 (average $234, median $240)
Firmwide (average $340, median $325)

**Bryan Cave (852),** St. Louis
Partners $340-$750 (average $525, median $510)
Associates $170-$510 (average $314, median $310)
Firmwide (average $424, median $405)

**Buchalter Nemer (146),** Los Angeles
Partners $260-$600 (average $448, median $450)
Associates $225-$450 (average $283, median $275)
Firmwide (average $384, median $375)

**Buchanan Ingersoll & Rooney (529),** Pittsburgh
Partners $300-$1,020
Associates $100-$520

**Bullivant Houser Bailey (153),** Portland, Ore.
Partners $275-$525
Associates $190-$325

**Burr & Forman (208),** Birmingham, Ala.
Partners $210-$495 (average $352, median $350)
Associates $165-$305 (average $235, median $230)
Firmwide (average $271, median $295)

**Butzel Long (243),** Detroit
Partners $300-$650
Associates $180-$290

**Carlton Fields (281),** Tampa, Fla.
Partners $305-$650 (average $435, median $435)
Associates $195-$335 (average $267, median $265)
Firmwide (average $334, median $325)

**Cooley Godward Kronish (618),** Palo Alto, Calif.
Partners $525-$980
Associates $285-$570

**Cozen O'Connor (478),** Philadelphia
Partners $240-$840 (average $457, median $455)
Associates $205-$650 (average $342, median $325)
Firmwide (average $397, median $385)

**Curtis, Mallet-Prevost, Colt & Mosle (235),** New York
Partners $675-$785 (average $730, median $730)
Associates $290-$575 (average $434, median $435)
Firmwide (average $520, median $515)

**Davis Wright Tremaine (467),** Seattle
Partners $300-$710 (average $455, median $450)
Associates $190-$405 (average $280, median $280)
Firmwide (average $395, median $395)

**Day Pitney (405),** Florham Park, N.J.
Partners $295-$710
Associates $220-$450

**Dickinson Wright (228),** Detroit
Partners $275-$550
Associates $180-$300

**Dickstein Shapiro (403),** Washington
Partners $475-$895 (average $607, median $605)
Associates $250-$475 (average $378, median $395)
Firmwide (average $493) (median $485)

**Dinsmore & Shohl (347),** Cincinnati
Partners $220-$495 (average $347, median $338)
Associates $160-$305 (average $202, median $198)
Firmwide (average $284, median $275)

**Dorsey & Whitney (670),** Minneapolis
Partners $235-$1,180 (average $505, median $510)
Associates $170-$820 (average $301, median $335)
Firmwide (average $407, median $430)

**Duane Morris (594)** (Philadelphia)
Partners $340-$755 (average $490, median $505)
Associates $230-$510 (average $326, median $350)
Firmwide (average $449, median $450)

**Dykema Gossett (374),** Detroit
Partners $265-$650 (average $415)
Associates $170-$435 (average $277)

**Edwards Angell Palmer & Dodge (576),** Boston
Partners $325-$755
Associates $170-$480
Firmwide (median $450)

**Epstein Becker & Green (372),** New York
Partners $350-$850 (average $501, median $495)
Associates $175-$450 (average $312, median $300)
Firmwide (average $406, median $400)

**Fisher & Phillips (208),** Atlanta
Partners $330-$505
Associates $195-$380

**Foley & Lardner (1,032),** Milwaukee
Partners (average $596, median $585)
Associates (average $405, median $395)
Firmwide $185-$985 (average $508, median $520)

**Ford & Harrison (179) ,** Atlanta
Partners $325-$585
Associates $245-$405

**Fowler White Boggs Banker (201*),** Tampa, Fla.
Partners $175-$525 (average $360, median $350)
Associates $160-$325 (average $222, median $220)
Firmwide (average $314, median $325)
(*Total prior to subsequent firm split.)

**Fox Rothschild (440),** Philadelphia
Partners $250-$590 (average $443, median $450)
Associates $215-$395 (average $275, median $260)
Firmwide (average $378, median $375)

**Fredrikson & Byron (233),** Minneapolis
Partners $250-$590 (average $402, median $395)
Associates $150-$315 (average $237, median $225)
Firmwide (average $340, median $340)

**Frost Brown Todd (342),** Cincinnati
Partners $225-$490 (average $317, median $310)
Associates $145-$260 (average $188, median $180)
Firmwide (average $272, median $270)

**Gardere Wynne Sewell** (281), Dallas
Partners $380-$750 (average $502, median $500)
Associates $210-$450 (average $306, median $300)
Firmwide (average $374, median $390)

**Gibbons (230),** Newark, N.J.
Partners $375-$700
Associates $220-$415

**GrayRobinson (213),** Orlando, Fla.
Partners $200-$650 (average $310, median $285)
Associates $125-$275 (average $164, median ($167)
Firmwide (average $239, median $252)

**Greenberg Traurig (1,840),** New York
Partners $335-$850 (average $520, median $535)
Associates $175-$525 (average $323, median $325)
Firmwide (average $426, median $425)

**Harris Beach (179),** Rochester, N.Y.
Partners $250-$475
Associates $140-$275

**Hiscock & Barclay (187),** Syracuse, N.Y.
Partners $190-$650 (average $361, median $359)
Associates $145-$430 (average $235, median $224)
Firmwide (average $319, median $322)

**Hodgson Russ (227),** Buffalo, N.Y.
Partners $240-$665 (average $355, median $350)
Associates $165-$450 (average $230, median $235)
Firmwide (average $303, median $300)

**Hogan & Hartson (1,175),** Washington
Partners $375-$900 (average $660, median $650)
Associates $150-$550 (average $410, median $400)
Firmwide (average $525, median $525)

**Holland & Hart (406),** Denver
Partners $295-$615 (average $414, median $405)
Associates $175-$355 (average $269, median $275)
Firmwide (average $350, median $345)

**Holme Roberts & Owen (228),** Denver
Partners $285-$635 (average $415, median $410)
Associates $160-$525 (average $294, median $265)
Firmwide (average $355, median $345)

**Howard Rice Nemerovski Canady Falk & Rabkin (102),** San Francisco
Partners $515-$795
Associates $275-$510

**Hughes Hubbard & Reed (334),** New York
Partners $625-$875
Associates $270-$600

**Husch Blackwell Sanders (629),** St. Louis
Partners $205-$740 (average $352, median $340)
Associates $150-$380 (average $218, median $215)
Firmwide (average $302, median $300)

**Jackson Kelly (187),** Charleston, W.Va.
Partners $200-$435 (average $238, median $247)
Associates $135-$335 (average $155, median $151)
Firmwide (average $214, median $212)

**Jackson Lewis (517),** White Plains, N.Y.
Partners $250-$595
Associates $180-$405

**Jenner & Block (482),** Chicago
Partners $525-$1,000 (average $616, median $575)
Associates $325-$495 (average $393, median $375)

**Jones, Walker, Waechter, Poitevent, Carrère & Denègre (264),** New Orleans
Partners $225-$620 (average $332, median $325)
Associates $140-$250 (average $186, median $180)
Firmwide (average $277, median $275)

**Kilpatrick Stockton (466),** Atlanta
Partners $310-$695 (average $485, median $475)
Associates $225-$400 (average $290, median $275)
Firmwide (average $400, median $395)

**Kelley Drye & Warren (378),** New York
Partners $430-$850
Associates $255-$520

**Knobbe, Martens, Olson & Bear (249),** Irvine, Calif.
Partners $375-$660 (average $473, median $450)
Associates $245-$430 (average $287, median $275)
Firmwide (median $362)

**Lane Powell (170),** Seattle
Partners $325-$550 (average $405, median $400)
Associates $195-$325 (average $270, median $275)
Firmwide (average $327, median $350)

**Lathrop & Gage (281),** Kansas City, Mo.
Partners $255-$490
Associates $180-$265

**Leonard, Street and Deinard (189),** Minneapolis
Partners $310-$530
Associates $200-$315

**Lewis, Rice & Fingersh (164),** St. Louis
Partners $225-$440
Associates $140-$305

**Lindquist & Vennum (185),** Minneapolis
Partners $280-$450 (average $367, median $375)
Associates $180-$295 (average $218, median $210)
Firmwide (average $309, median $330)

**Locke Lord Bissell & Liddell (707),** Dallas
Partners $375-$975 (average $527, median $525)
Associates $225-$450 (average $313, median $300)
Firmwide (average $433, median $450)

**Loeb & Loeb (310),** New York
Partners $450-$925 (average $651, median $650)
Associates $260-$500 (average $422, median $425)
Firmwide (average $534, median $500)

**Lowenstein Sandler (278),** Roseland, N.J.
Partners $400-$765
Associates $220-$405

**Luce, Forward, Hamilton & Scripps (187),** San Diego
Partners $350-$650 (average $483, median $483)
Associates $235-$460 (average $293, median $280)
Firmwide (average $397, median $400)

**Manatt, Phelps & Phillips (358),** Los Angeles
Partners $495-$850 (average $626, median $620)
Associates $290-$505 (average $407, median $410)
Firmwide (average $533) (median $550)

**Marshall, Dennehey, Warner, Coleman & Goggin (408),** Philadelphia
Partners $135-$400
Associates $120-$300

**McCarter & English (399),** Newark, N.J.
Partners $325-$635 (average $435, median $440)
Associates $215-$395 (average $280, median $285)
Firmwide (average $353, median $345)

**McElroy, Deutsch, Mulvaney & Carpenter (232),** Morristown, N.J.
Partners $295-$450 (average $250, median $235)
Associates $135-$225 (average $180, median $165)
Firmwide (average $195, median $215)

**McKee Nelson (202),** New York
Partners $665-$995
Associates $395-$630

**McKenna Long & Aldridge (435),** Atlanta
Partners $370-$750 (average $454)
Associates $220-$450 (average $274)

**Michael Best & Friedrich (229),** Milwaukee
Partners $235-$620 (average $391, median $375)
Associates $190-$330 (average $252, median $245)
Firmwide (average $340, median $305)

**Miller, Canfield, Paddock and Stone (387),** Detroit
Partners $275-$620 (average $425, median $425)
Associates $165-$375 (average $240, median $240)
Firmwide (average $347, median $355)

**Miller & Martin (198),** Chattanooga, Tenn.
Partners $210-$610 (average $354, median $360)
Associates $180-$305 (average $210, median $205)
Firmwide (average $316, median $330)

**Montgomery, McCracken, Walker & Rhoads (151),** Philadelphia
Partners $360-$585 (average $440)
Associates $195-$365 (average $270)
Firmwide (average $360)

**Moore & Van Allen (300),** Charlotte, N.C.
Partners $280-$770 (average $425, median $410)
Associates $180-$365 (average $256, median $250)
Firmwide (average $283, median $273)

**Nexsen Pruet (174),** Columbia, S.C.
Partners $250-$450
Associates $170-$250

**Nixon Peabody (699),** Boston
Partners $565-$845 (average $570, median $590)
Associates $230-$350 (average $370, median $365)
Firmwide (average $468, median $430)

**Ogletree, Deakins, Nash, Smoak & Stewart (428),** Greenville, S.C.
Partners $275-$600 (average $367)
Associates $185-$380 (average $266)
Firmwide (average $325)

**Patton Boggs (529),** Washington
Partners $360-$990 (average $586, median $570)
Associates $244-$535 (average $372, median $385)
Firmwide (average $440, median $455)

**Pepper Hamilton (514),** Philadelphia
Partners $385-$795
Associates $240-$395

**Perkins Coie (632),** Seattle
Partners $260-$785 (average $498)
Associates $165-$515 (average $329)

**Phelps Dunbar (258),** New Orleans
Partners $170-$450 (average $256, median $250)
Associates $130-$260 (average $171, median $165)
Firmwide (average $213, median $205)

**Phillips Lytle (179),** Buffalo, N.Y.
Partners $250-$475 (average $334, median $330)
Associates $155-$355 (average $230, median $220)
Firmwide (average $288, median $300)

**Polsinelli Shalton Flanigan Suelthaus (304),** Kansas City, Mo.
Partners $250-$600
Associates $175-$275

**Quarles & Brady (450),** Milwaukee
Partners $280-$625 (average $419, median $420)
Associates $200-$375 (average $252, median $245)
Firmwide (average $347, median $342)

**Reed Smith (1,558\*),** Pittsburgh
Partners $375-$900 (average $626, median $585)
Associates $235-$580 (average $423, median $390)
Firmwide (average $441, median $425)
(\*National Association for Law Placement figure. The firm recently reported an attorney count of 1,505.)

**Robinson & Cole (215),** Hartford, Conn.
Partners $320-$650 (average $436, median $440)
Associates $210-$350 (average $276, median $275)
Firmwide (average $346, median $350)

**Roetzel & Andress (227),** Akron, Ohio
Partners $225-$500 (average $333, median $325)
Associates $170-$295 (average $219, median $215)
Firmwide (average $292, median $300)

**Rutan & Tucker (140),** Costa Mesa, Calif.
Partners $315-$635
Associates $220-$370

**Saul Ewing (231),** Philadelphia
Partners $295-$800 (average $441, median $430)
Associates $205-$535 (average $285, median $255)
Firmwide (average $372, median $380)

**Schnader Harrison Segal & Lewis (189),** Philadelphia
Partners $275-$625
Associates $160-$375

**Schulte Roth & Zabel (481),** New York
Partners $695-$895 (average $770, median $755)
Associates $255-$650 (average $495, median $510)
Firmwide (average $550, median $530)

**Sedgwick, Detert, Moran & Arnold (380),** San Francisco
Partners $295-$650 (average $398, median $380)
Associates $185-$390 (average $262, median $260)
Firmwide (average $318, median $300)

**Sheppard, Mullin, Richter & Hampton (458),** Los Angeles
Partners $475-$795
Associates $275-$455 (up to $580 in New York)

**Shughart Thomson & Kilroy (179),** Kansas City, Mo.
Partners $240-$500
Associates $185-$245

**Shumaker, Loop & Kendrick (180),** Toledo, Ohio
Partners $225-$500 (average $329, median $325)
Associates $185-$380 (average $227, median $225)
Firmwide (average $297, median $315)

**Shutts & Bowen (203),** Miami
Partners $190-$540
Associates $190-$240

**Sills Cummis & Gross (165),** Newark, N.J.
Partners $395-$725
Associates $215-$425

**Smith, Gambrell & Russell (181),** Atlanta
Partners $260-$595
Associates $155-$335

**Snell & Wilmer (440),** Phoenix
Partners $300-$725 (average $444)
Associates $170-$420 (average $271)
Firmwide (average $354)

**Steptoe & Johnson LLP (506),** Washington
Partners $350-$895 (average $591, median $580)
Associates $210-$685 (average $384, median $395)
Firmwide (average $477, median $470)

**Steptoe & Johnson PLLC (182),** Clarksburg, W.Va.
Partners $200-$325
Associates $170-$250

**Stinson Morrison Hecker (324),** Kansas City, Mo.
Partners $275-$680 (average $363, median $373)
Associates $190-$290 (average $224, median $228)
Firmwide (average $293, median $275)

**Stoel Rives (350),** Portland, Ore.
Partners $290-$550
Associates $170-$365

**Strasburger & Price (194),** Dallas
Partners $300-$580
Associates $185-$395
Firmwide (average $334)

**Sullivan & Worcester (182),** Boston
Partners $450-$775 (average $603, median $600)
Associates $270-$490 (average $343, median $330)
Firmwide (average $485, median $495)

**Sutherland Asbill & Brennan (429),** Atlanta
Partners $395-$750 (average $543, median $530)
Associates $240-$450 (average $316, median $300)
Firmwide (average $379, median $380)

**Taft Stettinius & Hollister (337),** Cincinnati
Partners $200-$475 (average $354, median $355)
Associates $165-$325 (average $217, median $195)
Firmwide (average $294, median $295)

**Thompson Coburn (344),** St. Louis
Partners $295-$555
Associates $170-$400

**Thompson Hine (396),** Cleveland
Partners $275-$740 (average $425, median $420)
Associates $185-$510 (average $240, median $235)
Firmwide (average $330, median $325)

**Thompson & Knight (458),** Dallas
Partners $410-$785 (average $545, median $530)
Associates $250-$500 (average $334, median $345)
Firmwide (average $453, median $450)

**Ulmer & Berne (176),** Cleveland
Partners $230-$495 (average $319)
Associates $175-$310 (average $205)
Firmwide (average $262)

**Vedder Price (265),** Chicago
Partners $310-$685 (average $455, median $445)
Associates $235-$390 (average $290, median $290)
Firmwide (average $385, median $390)

**Venable (569),** Washington
Partners $380-$950 (average $530, median $525)
Associates $250-$425 (average $329, median $320)
Firmwide (average $440, median $440)

**White & Case (2,205),** New York
Partners $550-$1,260 (average $747)
Associates $160-$920 (average $456)
Firmwide (average $513)

**Wiggin and Dana (152),** New Haven, Conn.
Partners $360-$600
Associates $215-$375

**Williams Mullen (326),** Richmond, Va.
Partners $300-$625 (average $401, median $380)
Associates $170-$355 (average $260, median $255)
Firmwide (average $344, median $350)

**Winstead (281),** Dallas
Partners $365-$655 (average $465)
Associates $215-$385 (average $282)
Firmwide (average $390)

**Winston & Strawn (1,004),** Chicago
Partners $400-$975 (average $622)
Associates $210-$625 (average $376)
Firmwide (average $448)

**Womble Carlyle Sandridge & Rice (505),** Winston-Salem, N.C.
Partners $285-$750 (average $448, median $450)
Associates $140-$370 (average $275, median $275)
Firmwide (average $248, median $200)

**Wyatt Tarrant & Combs (198),** Louisville, Ky.
Partners $225-$450 (average $340, median $345)
Associates $180-$255 (average $210, median $210)
Firmwide (average $300, median $310)

**EXHIBIT D**

STATE OF NORTH CAROLINA

COUNTY OF UNION

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
04-CVS-2301

REGINALD C. MILLS and MISTY OWENS,
individually and on behalf of a class of all those
similarly situated,

Plaintiffs,

v.

HENDRICK AUTOMOTIVE GROUP, et al.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

## ORDER AND JUDGMENT GRANTING PLAINTIFFS' UNOPPOSED MOTION FOR APPROVAL OF ATTORNEYS' FEES AND EXPENSES, INCENTIVE AWARDS AND CLASS NOTICE ADMINISTRATION EXPENSES

THIS CAUSE coming on for hearing before the undersigned Superior Court Judge on

February 5, 2010, pursuant to this Court's Orders dated November 16, 2009 and December 4,

2009, and pursuant to the Plaintiffs' Unopposed Motion for Approval of Attorneys' Fees and

Expenses, Incentive Awards and Class Notice Administration Expenses, in order for this Court

to conduct a hearing to determine whether the Motion should be approved; and the Court noting

that the motion is unopposed by Hendrick Automotive Group, Hendrick Management, LLC,

South Boulevard Auto Investors Company Limited Partnership and Charlotte Automotive

Company (hereafter "Settling Defendants"); and the Settlement Class Members being

represented by Class Counsel, including Gary K. Shipman and Mona Lisa Wallace, and the

Settling Defendants being represented by their attorneys, including John S. Arrowood, Richard

B. Fennell and John B. Smith.

**AND THE COURT** having read and considered the Settlement Agreement, the Notice Plan, and Memoranda submitted by Class Counsel, having received evidence at the hearing, having heard arguments from Class Counsel and the Settling Defendants, and being further advised in the premises, now makes the following:

## FINDINGS OF FACT

1.      This action was commenced on November 30, 2004, and on July 13, 2009, this action was certified as a class action, pursuant to Rule 23 of the North Carolina Rules of Civil Procedure, by the Honorable John O. Craig, III, Superior Court Judge, defining two classes.

2.      After more than five years of intensive litigation in this action and as a result of numerous mediations and intensive, arm's length negotiations between Class Counsel and Settling Defendants, the parties reached accord with respect to a Settlement that provides substantial benefits to Settlement Class Members, in return for a release and dismissal of the claims at issue in this case, as set forth more fully in the parties' Settlement Agreement. The parties' Settlement Agreement was submitted to the Court on November 13, 2009, and was preliminarily approved pursuant to the Court's Order Granting Preliminary Approval of Settlement Agreement dated November 16, 2009, as amended by Order dated December 4, 2009.

3.      The Settlement Class, which eliminates the exclusions, is broader than the class certified in the Court's Class Certification Order dated July 13, 2009 and thereby provides benefits to a broader class of persons.

4.      The Settlement Class is defined as: "all individuals, proprietorships, partnerships, corporations, and other entities (hereinafter 'persons and entities') that purchased or leased any vehicle from any Designated Dealership containing the exterior/interior product known as Car Care, during the period from November 30, 2000 to November 30, 2004."

5.     Pursuant to the Settlement, the Defendants are to fund $4,207,320.00 within seven days after the Action becomes "Final" (as that term is defined in the parties' Settlement Agreement) in an interest bearing account for payment to Class Members. In the event that a Class Member to whom distribution is due cannot be found during the six month period after this Action becomes Final and after the Class Notice Administrator has applied good faith efforts to locate such person, such amount will be paid by the Defendants to one or more nonprofit charitable organizations as approved by the Court. Should there remain funds for which the eligible Class Members cannot be found at the end of the six month period, the Parties are instructed to file with the Court a motion for approval of one or more Cy Pres nonprofit recipients of said funds, and the Court retains continuing jurisdiction in this regard.

6.     As part of the Order Granting Preliminary Approval, this Court approved a proposed Notice Plan and Class Notice, which provided Settlement Class Members notice of this Proposed Settlement.

7.     Class Counsel has filed with the Court a Class Administration Submission reflecting that the mailing of the Court-approved notice, and other dissemination and publicizing of the Class Notice consistent with the Notice Plan, has been completed in accordance with due process standards.

8.     Class Counsel has paid the cost and expense of implementing the Notice Plan, including mailing the Class Notice.

9.     The total amount to be paid by Defendants under the Settlement Agreement is $5,616,630.00. Of that, the amount of $4,207,320.00 will be paid to Class Members (and with regard to Class Members who cannot be found, to a Cy Pres recipient subject to Court approval).

The requested attorneys' fees and costs amount of $1,389,310.00, represents less than 25% of the total amount of $5,616,630.00.

      10.    The record reflects that Class Counsel incurred significant time and expense in litigating this matter. Subsequent to the filing of the Class Action Complaint in Union County Superior Court on November 30, 2004, Class Counsel engaged in a variety of tasks consuming a substantial amount of time. These tasks included but were not limited to:

    a.  Amending the Complaint as of right under Rule 15 of the North Carolina Rules of Civil Procedure on December 15, 2004, prior to Defendants' answering, primarily in order to identify the corporate Defendants more accurately;

    b.  Moving for "exceptional" case designation under Rule 2.1 of the General Rules of Practice for the Superior and District Courts on February 16, 2005;

    c.  Evaluating Defendants' initial Answer filed on February 17, 2005 and responding to Defendants' motion for referral to the North Carolina Business Court as a "complex business" case under Rule 2.1;

    d.  Preparing for and attending a hearing on the issue of referral as an "exceptional" or "complex business" case before the Honorable Susan C. Taylor, who ordered the case referred to a special Rule 2.1 Judge by letter dated June 29, 2005 to the Honorable I. Beverly Lake, Jr;

    e.  Meeting and reviewing information from the second Plaintiff Misty Owens;

    f.  Moving to amend the complaint for good cause under Rule 15 of the North Carolina Rules of Civil Procedure on April 11, 2006 so as to add Misty Owens as a second class representative and to add related claims, briefing said issues, and attending a hearing with regard to the motion, which motion the Court allowed in part by Order dated June 5, 2006.

    g.  In accordance with the Court's Order, filing the Second Amended Complaint on June 12, 2006.

    h.  Reviewing Defendants' Answers denying relevant allegations and raising numerous defenses, including those filed on July 31, 2006 and August 14, 2006, responding to the Second Amended Complaint.

    i.  Engaging in significant discovery including i) drafting and serving of written discovery requests; ii) responding to the written discovery requests served by the Defendants; iii) preparing for and attending and/or taking numerous depositions; iv) preparing for and defending the depositions of the two named Plaintiffs; v) filing motions and briefs with regard to discovery disputes; vi) appearing at

hearings before the Court for adjudication with regard to said discovery disputes; vii) assisting with a Pilot Study of representative deal files; and viii) otherwise processing and reviewing thousands of documents produced in the matter;

j. Preparing and filing Plaintiffs' motion to certify this matter as a class action pursuant to the provisions of Rule 23 of the North Carolina Rules of Civil Procedure on August 29, 2008, and relevant supporting materials including the Affidavits of Reginald C. Mills, Misty Owens, Gary Shipman, Esq. and Mona Wallace, Esq.

k. Reviewing and responding to Defendants' Motion to Dismiss filed on September 16, 2008.

l. Preparing for and attending the hearing on the above-referenced motions for class certification and to dismiss;

m. Preparing and filing a Class Notice Proposal after the entry on July 13, 2009 of the Court's Order on Plaintiffs' Motion for Class Certification and Defendants' Motion to Dismiss.

n. Preparing for and attending several mediation sessions with regard to the matter; and

o. Otherwise incurring significant fees and expenses in regard to the prosecution of this Class Action over the years of its pendency.

**NOW, THEREFORE, ON THE BASIS OF THE FOREGOING FINDINGS OF FACT, THE COURT HEREBY MAKES THE FOLLOWING:**

## CONCLUSIONS OF LAW

1.    This Court has jurisdiction over the parties and the subject matter of this proceeding.

2.    The determination of attorney fees "requires the application of equitable principles." *Long v. Abbott Labs.*, 1999 WL 33545517, *5 (Mecklenburg County Super. Ct. July 30, 1999); *see also In re Senergy & Thoro Class Action Settlement*, 1999 WL 33563728, *6 (New Hanover County Super. Ct., July 14, 1999) (same). "North Carolina does not impose mechanical guidelines in applying equitable principles to these determinations. Trial courts

should also correlate the attorneys' compensation with the structure of the settlement benefits the attorneys negotiated for the class." *Long*, 1999 WL 33545517, *6.

3.     In determining if the fee is fair, courts have examined a) what percentage of the overall recovery the fees represent (otherwise called, the "percentage of recovery" analysis); b) how the actual hours spent on the case compare to the fee amount sought (otherwise called, a "lodestar" analysis); and c) the traditional factors reviewed in deciding if a fee petition is reasonable, regardless of whether the case is a class action or not (these factors are set forth in Rule 1.5(b) of the North Carolina Rules of Professional Conduct). *See Long*, 1999 WL 33545517, *5 (so stating); *In re Senergy*, 1999 WL 33563728, *9 (same).

4.     Accordingly, below, the Court will apply a) the percentage of recovery analysis; b) the lodestar analysis; and c) the factors set forth in Rule 1.5(b) of the North Carolina Rules of Professional Conduct.

5.     Under a percentage of recovery analysis, the total amount payable by Defendants under the Settlement Agreement is $5,616,630.00. Of that, the amount of $4,207,320.00 will be paid to Class Members (and with regard to Class Members who cannot be found, to a Cy Pres recipient). The requested attorneys' fees and costs amount of $1,389,310.00, represents less than 25% of the total amount of $5,616,630. This percentage of recovery is reasonable. *See Byers v. Carpenter*, 1998 WL 34031740, *10-12 (approving class action fee petition in which "approximately $2,300,000 will be paid to the members of the class" and court approved "fees in the amount of $1,166,666.66 and expenses to date in the amount of $96,758.37"); *Smith v. Krispy Kreme Doughnut Corp.*, 2007 WL 119157, *4 (M.D.N.C. Jan. 10, 2007) ("Attorneys fees are hereby awarded to Class Counsel in the amount of $1,235,000 (which represents 26% of the cash recovery obtained by the Class)..."); Affidavit of Professor Geoffrey P. Miller dated

December 1, 2004 filed in *MJM Investigations, Inc. v. Microsoft Corp.*, 00-CVS-4073 (N.C. Business Court) (average fee nationally is 30%).

6.     The lodestar approach awards fees based upon a reasonable hourly rate for the time reasonably expended on the litigation, which is then increased by a multiplier or fee enhancer to encourage and reward counsel undertaking difficult contingent fee cases, in which there is a potential that counsel may receive nothing for thousands of hours of work. *See Byers v. Carpenter*, 1998 WL 34031740, *11 (approving class action fee petition and noting lodestar analysis); *DeLoach v. Philip Morris Cos.*, 2003 WL 23094907, *3 (M.D.N.C. Dec. 19, 2003) ("Under the lodestar method, the fee award is based on the reasonable hours expended multiplied by a reasonable hourly rate."); *Barber v. Kimbrell's, Inc.*, 755 F.2d 216 (4th Cir. 1978).

7.     The number of hours expended in the prosecution of this action was reasonable considering the complexity of the issues involved and the ultimate result obtained. Generally, the lodestar is calculated by "multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 652 (4th Cir. 2002).

8.     Here, the total fees of Class Counsel applying the firms' hourly rates for this case come to $901,282.75. (Shipman Aff. ¶ 13, Wallace Aff. ¶ 26). The amount of fees and costs sought (less $20,000 in total incentive awards) is $1,389,310.00. Thus, the requested award of fees compared to that figure yields a multiplier of less than two, which is reasonable. *See Byers*, 1998 WL 34031740, *11 (approving class action fee petition and noting that under lodestar analysis, "[a] multiplier … is appropriate due to the contingency of success, the outstanding result obtained by plaintiffs, the large time demands of this case and the other factors set out above in the findings of fact. A reasonable multiplier based on these factors would be 2 to 4.");

*Deloach*, 2003 WL 23094907, *11 ("A multiplier of 4.45, in conjunction with an adjusted lodestar of $15,914,905.50, results in a fee award of $70,821,329.48. This figure represents a reasonable fee for the services provided by Plaintiffs' Co-Lead Counsel in this case.").

9. The factors to be considered under Rule 1.5(b) of the North Carolina Rules of Professional Conduct when evaluating the reasonableness of a fee are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. A review of the record and the submissions and filings herein in light of all of the applicable factors demonstrates that the fee is reasonable and should be approved.

10. In awarding attorneys' fees in class actions, the results obtained are generally regarded as the decisive factor. Here, the value of the benefit to the Class is $4,207,320.00. The results obtained clearly support a significant fee award. Individual consumers and purchasers will receive checks for $195 representing over 60% on average of what they paid for Car Care.

11. As part of the Class Notice, Class Counsel specifically advised class members of Class Counsels' intention to request attorneys' fees of $1,389,310.00, including costs and expenses, in addition to the incentive payments in the amount of $10,000 to each Class Representative. All class members, therefore, were on notice that attorneys' fees amounting to $1,389,310.00, including costs and expenses, would be requested by Class Counsel. The Court

notes that the record reflects that out of the entire class, no Class Members have filed any opposition to the requested attorneys' fees and costs.

12.    The Class Representatives, Reginald C. Mills and Misty Owens, are entitled to and are hereby awarded payment of $10,000.00, each, in recognition of the efforts they have undertaken and the risk they incurred on behalf of the Class.

**NOW, THEREFORE, ON THE BASIS OF THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

1.    The Motion for Approval of Attorneys' Fees and Expenses, Incentive Awards and Class Notice Administration Expenses is **GRANTED.**

2.    Class Counsel shall be paid $1,409,310.00 for their total fees and expenses in this case in accordance with the Settlement Agreement.

3.    Out of that amount, Class Counsel are instructed to remit to the Class Plaintiffs, Mr. Mills and Ms. Owens, $10,000 each as incentive awards in accordance with the Settlement Agreement.

SO ORDERED this ___5th___ day of February, 2010.

The Honorable John O. Craig, III

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
                                                      SUPERIOR COURT DIVISION
COUNTY OF UNION                                  04 CVS 2301

REGINALD C. MILLS and MISTY OWENS, individually and on          )
behalf of a class of all those similarly situated,                            )
                                                                                          )
Plaintiffs,                                                                              )
                                                                                          )
v.                                                                                         )
                                                                                          )
HENDRICK MANAGEMENT CORPORATION, *et al.*,                        )
                                                                                          )
Defendants.                                                                          )

<u>AFFIDAVIT OF MONA LISA WALLACE, ESQ. IN SUPPORT OF PLAINTIFFS'
MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS</u>

Personally appeared before me, Mona Lisa Wallace, Esq., who being first duly sworn, does

depose and say:

1.      My name is Mona Lisa Wallace. I am over the age of eighteen (18). I have personal

knowledge of the facts stated herein, and am fully competent to make the statements set forth

below. I am one of the attorneys for Plaintiffs in the above-captioned matter.

**A.      Personal Qualifications.**

2.      I have been a lawyer representing consumers and victims for over 25 years. During

that time, I, and my law firm, Wallace & Graham, P.A., have represented clients in the areas of civil

litigation, workers compensation, general and premises liability, insurance coverage, consumer

protection, ERISA, medical monitoring, consumer fraud, fair debt collection practices, predatory

lending, personal injury, mass and toxic torts and products liability including asbestos, silica,

radiation, chemical poisonings, prescription drugs, and other similar occupational and product

related claims. These claims and matters have often involved mass and/or class claims.

3. I attended the University of North Carolina at Chapel Hill for my undergraduate education. I was a National Merit Scholar, and received a Bachelor of Arts Degree with Honors in 1976.

4. I attended Wake Forest University School of Law for my postgraduate education, and received a Juris Doctor Degree with Honors in 1979.

5. Since 1979 I have been engaged in the private practice of law in Salisbury, North Carolina, concentrating in civil litigation.

6. My professional affiliations, licenses and memberships include: North Carolina State Bar; South Carolina State Bar; Texas State Bar; Tennessee State Bar, Pennsylvania State Bar, United States District Courts for the Western, Eastern & Middle Districts of North Carolina; United States Supreme Court; South Carolina Supreme Court; United States District Court for the District of South Carolina; and United States Court of Appeals for the Fourth Circuit, among others. Further, I have extensive experience practicing before other judicial and administrative tribunals and forums.

7. Much of my legal career has been focused on consumer rights issues. I have had a long and active involvement in Public Justice. This organization is the United States' largest public interest law firm. I am the current President, a member of the Executive Committee, and a member of the Board of Directors of this organization. Public Justice is a national public interest law firm with offices in Washington, D.C. and Oakland, California. A volunteer network of more than 3,000 of the best trial lawyers in the United States, this organization in which I am most actively involved, is dedicated to accepting and litigating cases that involve the public good. I have held various other positions including Public Justice Diversity Committee, Co-Chairman of the Program Development

Committee, Case Development Committee, Co-Chairman of the Major Donor/Special Gifts Committee, North Carolina State Coordinator, and Vice President of this organization.

8.　　I have been active with the North Carolina State Bar, including as Former Advisory Member of the Rules of Professional Conduct Review Committee, Former Member of the Public Service and Information Committee, Former Member of the Family Law Committee. My other Professional Appointments have included appointment to the Wake Forest School of Law Board of Visitors, to the Catawba College Board of Trustees, and to the Hood Theological Seminary Board of Trustees.

9.　　I am a member of the North Carolina Academy of Trial Lawyers. My involvement with this organization includes appointment to the Former Executive Committee for Workers' Compensation, to the Legislative Committee, and to the PAC (Political Action Committee) Trustee.

10.　　I am a member of the American Association for Justice (AAJ), formerly the Association of Trial Lawyers of America (ATLA), and the North Carolina Association of Women Attorneys. In 2006, I was presented the NC ATLA's Ebbie Award.

11.　　I am a member of the American Bar Association and the Association of Trial Lawyers of America (Patron). I am also a member of the ABA Task Force on Asbestos within the Tort Trial and Insurance Practice Section.

12.　　I have been a speaker at Seminars and Conferences on legal issues throughout North Carolina.

13.　　I have been actively involved in civic and charitable activities including my most recent appointment to the Raoul Wallenberg Committee of the United States, an organization dedicated to educating school children and prisoners about historical heroes.

**B.    Qualifications of the Law Firm.**

14.    Our firm has special expertise in representing clients in other class action litigation.

15.    Other pending class action cases in which our law firm is lead counsel or actively involved co-counsel include:

a.    *George, et al. v. Duke Energy Retirement Cash Balance Plan, et al.*, Civ. No. 8:06-CV-373 (USDC, DSC) (class action claims arising under ERISA in regard to a pension plan);

b.    *Curtis, et al. v. Alcoa Inc.*, Civ. No. 3:06-CV-448 (USDC, EDTN) (mass and class action claims arising under ERISA in regard to retirement medical benefits);

c.    *Owens and Price v. Automobile Protection Corporation and Sonic Automotive, et al.*, class arbitration before the American Arbitration Association, Consolidated Case No. 30 459 00642 05 (unfair and deceptive finance and sales practices involving car dealer chain);

d.    *Clark v. Alan Vester Auto Group*, Civ. No. 06 CVS 141 (Vance County Superior Court) (class action against car dealer chain);

e.    *Murdock v. Rebate Cash Advance*, Civ. No. 06-CVS-1865 (Iredell County Superior Court) and AAA class arbitration (class action/arbitration against payday lender);

f.    *Kucan v. Advance America*, Civ. No. 04-CVS-2860 (New Hanover County Superior Court) (class action against payday lender); *Hager v. Check into Cash*, Civ. No. 04-CVS-2859 (New Hanover County Superior Court) (same);

g.    *McQuillan v. Check n Go*, Civ. No. 04-CVS 2858 (New Hanover County Superior Court) (same);

h.    *Knox v. First Southern*, Civ. No. 05-CVS-0445 (New Hanover County Superior Court) (same);

i.    *Torrence v. Nationwide Budget*, Civ. No. 05-CVS-0447 (New Hanover County Superior Court) (same).

16.    Our firm has special expertise in representing clients in other complex litigation. Other past or pending complex litigation in which our law firm is or was lead counsel or actively involved co-counsel include:   mass tort claims against Weyerhaeuser, Alcoa, Duke Energy, Fieldcrest Cannon, and other large corporations; representation of thousands in occupational

disease, mass tort, and/or medical monitoring cases and claims; and litigation of numerous complex occupational disease cases in other States with local co-counsel.

17. My law firm is experienced in and capable of administering and processing large groups of claims and ongoing lawsuits, and has settled and continues to settle claims and cases for large groups of employees and retirees on a regular basis. My firm has had extensive experience in handling large number of claimants in complex litigation and class action litigation.

18. Mr. Hughes, who incurred much of the primary work, is an attorney licensed to practice law in North Carolina. He has experience representing consumers in the areas of civil litigation, insurance coverage, consumer protection, predatory lending, ERISA claims, truth in lending, fair debt collection, class actions and complex civil litigation. Mr. Hughes attended the University of North Carolina at Chapel Hill for his undergraduate education. He received a Bachelor of Arts Degree in English in 1986. He attended Wake Forest University School of Law and received a Juris Doctor Degree, cum laude, 1995. Since 1995, he has been engaged in the private practice of law in North Carolina, concentrating in civil litigation. His professional affiliations, licenses and memberships include the North Carolina State Bar, American Bar Association, United States District Courts for the Eastern, Middle and Western Districts of North Carolina, and United States Court of Appeals for the Fourth Circuit.

19. Myself and the attorneys involved in this case have ability and experience in these matters and are reputable and qualified. Our firm has an excellent reputation, particularly in North Carolina where this case was litigated and where the majority of the clients reside.

**C. Review of Relevant Factors with Regard to Fees and Costs.**

20. Pursuant to RPC 1.5: "(a) A lawyer shall not make an agreement for, charge, or collect an illegal or clearly excessive fee or charge or collect a clearly excessive amount for

expenses. The factors to be considered in determining whether a fee is clearly excessive include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent." Applying each of those factors:

21.    **The time and labor required** -- This case has taken a substantial amount of time and labor. There were numerous depositions, and drafting, discovery and briefing were all major undertakings.

22.    Prior to filing the lawsuit, our law firm extensively researched the applicable law and facts. Significant work was put into drafting and preparing the Complaint, developing the factual and legal allegations and claims, and meeting and reviewing information from the original Plaintiff Reginald C. Mills prior to when we instituted this action by the filing of a Class Action Complaint in Union County Superior Court on November 30, 2004, naming HAG and related Defendants.

23.    Subsequently our firm incurred additional significant time and expense including but not limited to:

   a.   Amending the Complaint as of right under Rule 15 of the North Carolina Rules of Civil Procedure on December 15, 2004, prior to Defendants' answering, primarily in order to identify the corporate Defendants more accurately;

   b.   Moving for "exceptional" case designation under Rule 2.1 of the General Rules of Practice for the Superior and District Courts on February 16, 2005;

c. Evaluating Defendants' initial Answer filed on February 17, 2005 and responding to Defendants' motion for referral to the North Carolina Business Court as a "complex business" case under Rule 2.1;

d. Preparing for and attending a hearing on the issue of referral as an "exceptional" or "complex business" case before the Honorable Susan C. Taylor, who ordered the case referred to a special Rule 2.1 Judge by letter dated June 29, 2005 to the Honorable I. Beverly Lake, Jr;

e. Meeting and reviewing information from the second Plaintiff Misty Owens;

f. Moving to amend the complaint for good cause under Rule 15 of the North Carolina Rules of Civil Procedure on April 11, 2006 so as to add Misty Owens as a second class representative and to add related claims, briefing said issues, and attending a hearing with regard to the motion, which motion the Court allowed in pertinent part by Order dated June 5, 2006.

g. In accordance with the Court's Order, filing the Second Amended Complaint on June 12, 2006.

h. Reviewing Defendants' Answers denying relevant allegations and raising numerous defenses, including those filed on July 31, 2006 and August 14, 2006, responding to the Second Amended Complaint.

i. Engaging in significant discovery including i) drafting and serving of written discovery requests; ii) responding to the written discovery requests served by the Defendants; iii) preparing for and attending and/or taking numerous depositions; iv) preparing for and defending the depositions of the two named Plaintiffs; v) filing motions and briefs with regard to discovery disputes; vi) appearing at hearings before the Court for adjudication with regard to said discovery disputes; vii) assisting with a Pilot Study of representative deal files; and viii) otherwise processing and reviewing thousands of documents produced in the matter;

j. Preparing and filing Plaintiffs' motion to certify this matter as a class action pursuant to the provisions of Rule 23 of the North Carolina Rules of Civil Procedure on August 29, 2008, and relevant supporting materials including the Affidavits of Reginald C. Mills, Misty Owens, Gary Shipman, Esq. and Mona Wallace, Esq.

k. Reviewing and responding to Defendants' Motion to Dismiss filed on September 16, 2008.

l. Preparing for and attending the hearing on the above-referenced motions for class certification and to dismiss;

m. Preparing and filing a Class Notice Proposal after the entry on July 13, 2009 of the Court's Order on Plaintiffs' Motion for Class Certification and Defendants' Motion to Dismiss.

n. Preparing for and attending several mediation sessions with regard to the matter; and

o. Otherwise incurring significant fees and expenses in regard to the successful prosecution of this substantial Class Action over the years of its pendency.

24. In short, my firm incurred significant fees and expenses with regard to all stages and work activities necessary for this matter to be litigated, including pre-lawsuit research, discovery of and a thorough review and analysis of thousands of pages of documents, the taking of relevant depositions, research and analysis of the law, motion practice, discovery disputes, and related activities naturally required in order to actively litigate the subject claims for more than five years.

25. Our firm has prepared detailed time and expense records which reflect the (a) time and dates of services; (b) the substance of any service and the identity of the person rendering the service, (c) the attorney and staff hourly rates charged or paid, and (d) details of any other actual out-of-pocket expenses sought, based upon our careful review of the case file, including contemporaneous time and expense records, notations made at or near the time the fees and expenses were incurred by or from information transmitted by a person with knowledge of the matters being recorded, time card reports, attorney and staff notes, research and deposition files, and other parts of the file all in an effort to provide accurate time and expense records. These records accurately set forth the services provided and the time required to perform those services.

26. As reflected in those records, which are available for Court review, and which are summarized in the time report summary attached hereto at **Tab 1**, our firm expended 1,398.16 hours in this matter and applying the hourly rates for attorneys, paralegals and staff, our firm's total "lodestar" figure is $351,572.00. The hourly rates used in this calculation do not include charges for expense items. Expense items are billed separately and such charges are not duplicated in the firm's billing rates. In addition, our law firm advanced significant unreimbursed expenses in this

matter in the amount of $19,567.49. These expenses are reasonable and are reflected in the books and records of the firm and are summarized at Tab 1 hereto.

27. **The novelty and difficulty of the questions involved** – The case involved certain complex factual and legal issues. This may be evidenced by the complexity of the legal arguments made in the briefs that have been filed. The complexity of the case and evolving nature of the law required Class counsel to monitor other active cases during the pendency of this case, and to perform regular searches of Westlaw and PACER so as to monitor ongoing developments in the case law. The unsettled nature of the law increased the risk of the case.

28. **Skill requisite to perform the legal services; preclusion of other employment** -- This case required dedicated work by attorneys, paralegals, and staff of our office. The work took diligence and skill. Attorneys and staff of our office were precluded or limited in regard to taking on other matters as a result of the time commitments of this case. In particular, Mr. Hughes of our office was precluded from taking on or restricted in his ability to participate in certain other matters as a result of the time commitments of this case.

29. **The fee customarily charged in the locality for similar legal services** – As discussed in the supporting brief, Plaintiffs have applied rates for purposes of this case which are in line with rates approved by the Courts in other similar cases.

30. **The time limitations imposed by the client or by the circumstances** – As reflected in the history of the case, more challenging time limitations were at times imposed by the circumstances, thereby requiring harder or faster work.

31. **The nature and length of the professional relationship with the client** – The firm has worked closely with the Class Representative Plaintiffs and expended time and expenses in communicating, meeting with, and defending at deposition, said Plaintiffs.

32.    **Whether the fee is fixed or contingent** – The case was taken on a contingent fee basis thereby supporting an increased fee in light of the risk to the firm. The risk to our firm was increased because our firm accepted the case under a contingent fee basis without requiring any retainer, deposit or hourly payment from our clients, at any time, whatsoever. Accordingly, our law firm bore a substantial financial risk in the event the case had failed.

33.    **The amount involved and the results obtained** – Class Counsel obtained an excellent result for the Class both with regard to the amount of recovery obtained and the results otherwise obtained.

34.    The Settlement reached by Class Counsel is an excellent recovery for the Class. The total amount paid by Defendants under the Settlement Agreement is $5,616,630. Of that, the amount of $4,207,320.00 will be paid to Class Members (and with regard to Class Members who cannot be found, to a Cy Pres recipient). The requested attorneys' fees and costs amount of $1,389,310.00, represents less than 25% of the total amount of $5,616,630.

35.    The settlement provides for a funding commitment by the Defendants of $4,207,320.00 in an interest-bearing account with $195 payments going out to Class Members. In the event that a Class Member cannot be located, the amount remaining in the Settlement Fund Account will be paid by the Defendants to one or more non-profit charitable organization(s).

36.    The Settlement provides for an opt-out Settlement Class, certified against Defendants Hendrick Automotive Group, Hendrick Management, LLC, South Boulevard Auto Investors Company Limited Partnership and Charlotte Automotive Company, and for benefits to be provided to Class Members in simple and straightforward terms, with payments of $195.00 being sent to all Class Members that reasonably can be located within six months after the action becomes final and after the Class Notice Administrator applies good faith efforts to locate such persons. This

amount represents an average recovery of more than 60% of the average purchase price of the Car Care product, given that the average price of Car Care based upon Plaintiffs' own research and representations made by the Defendants was $319.64.

37.    Settlement Class members are not required to take any action in order to participate in the Settlement. The Settlement Fund is non-reversionary. Any funds unclaimed at the end of the distribution period will be donated to a charitable organization approved by the Court.

38.    To date, no individual to the undersigned's knowledge has filed an objection to the proposed class settlement. To the contrary, the undersigned and the firm have been told by many potential class members that they support and are grateful for the settlement.

[SIGNATURE PAGE TO FOLLOW]

The Affiant further sayeth not.

*Mona Lisa Wallace*
_____
Mona Lisa Wallace

SWORN to and subscribed before me
this the 20ᵗʰ day of _January_, 2010.

_Norma J. Avalos Taylor_ (SEAL)
NOTARY PUBLIC
My Commission Expires: 12/8/2012

12

**TAB 1 to WALLACE AFFIDAVIT**

# WALLACE & GRAHAM, PA – HENDRICK CLASS ACTION

Time Report from Inception through January 20, 2010

| Name | | Hours | Rate | Lodestar |
|---|---|---|---|---|
| Mona Wallace | (P) | 77.7 | $400.00 - $475.00 | $34,710.00 |
| John Hughes | (A) | 854.6 | $300.00 - $375.00 | $270,217.50 |
| Lea Keller | (A) | 12.9 | $150.00 - $200.00 | $2,580.00 |
| Christopher Exline | (A) | 22.25 | $225.00 | $5,006.25 |
| Whitney Wallace | (A) | 4.0 | $175.00 | $700.00 |
| Robert J Perkins | (A) | 10.0 | $175.00 | $1,750.00 |
| | | | | |
| Aaron Goss | (IT) | 30.6 | $250.00 | $7,650.00 |
| Tammy Coon | (IT) | 29.33 | $75.00 | $2,199.75 |
| | | | | |
| Cindy Cauble | (PL) | 11.39 | $75.00 | $854.25 |
| Kathy Hoffner | (PL) | .03 | $75.00 | $2.25 |
| Karen Sellers | (PL) | 27.67 | $75.00 | $2,075.25 |
| Linda Wike | (PL) | 48.40 | $75.00 | $3,630.00 |
| Michelle Davis | (PL) | 47.72 | $75.00 | $3,579.00 |
| Megan Shaver | (PL) | 34.79 | $75.00 | $2,609.25 |
| Pat Staeblein | (PL) | .5 | $75.00 | $37.50 |
| Terry Taylor | (PL) | 3.12 | $75.00 | $234.00 |
| | | | | |
| Various Other Staff* | (LA) | 183.16 | $75.00 | $13,737.00 |
| | | | | |
| **Total:** | | **1398.16** | | **$351,572.00** |

*Angela Pope; Connie Brown; Crystal Lambert; Gloria Thompson; Janice Junda; Kari Lovette; Mary Cox; Randi Farrow; Sheelagh Donaldson; Sandra Ward; Teresa Faggart; Tiziana Lake.

(P) Partner
(A) Associate
(IT) IT Specialists
(PL) Paralegal
(LA) Legal Assistants & Clerical Staff

# WALLACE AND GRAHAM – HENDRICK CLASS ACTION
Expense Report from Inception through January 20, 2010

| Disbursement | Total |
|---|---|
| Travel, Hotel & Meals | $545.44 |
| Photocopies | $555.65 |
| Telephone, Facsimile | $24.88 |
| Federal Express, UPS, Postage | $342.99 |
| Deposition & Hearing Transcripts & Mediator | $3420.87 |
| Document Copying Service | $4750.16 |
| Expert/Consultant Fees | $4377.00 |
| Online Library Research | $5465.50 |
| Filing Fees | $85.00 |
| Miscellaneous | |
| **TOTAL** | **$19,567.49** |

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| RICHARD ANTHONY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:05CV00806 |
| | ) | |
| KOCH INDUSTRIES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING PLAINTIFFS' UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS

This action is before the Court on the Plaintiffs' Unopposed Motion for Award of Attorneys' Fees and Costs. The Magistrate Judge has recommended, without objection, that the motion be granted in full. The Court hereby adopts that Recommendation. Upon consideration of the motion, supporting brief, accompanying declarations, the Court's Preliminary Approval Order, the Notice provided to the Class, the hearing held pursuant to Fed. R. Civ. P. 23(e) on July 17, 2007, and other pertinent parts of the record in this case, and for good cause shown, the Court finds that the motion is due to be, and hereby is, granted.

**IT IS HEREBY ORDERED** as follows:

1. To the extent not otherwise defined herein, all capitalized terms shall have the same meaning as used in the Settlement Agreement and Release ("Settlement Agreement") attached as Exhibit 1 to Plaintiffs' Unopposed Motion for Order Preliminarily Approving

Class Action Settlement, Conditionally Certifying Settlement Class, Directing Notice to Class, and Setting Hearing on Final Approval, and incorporated herein by reference.

2.     The Court has jurisdiction over the subject matter of this action, the Defendants, and the Class.

3.     Notice of the requested award of attorneys' fees and reimbursement of costs and expenses was directed to Class members in a reasonable manner through first-class mailing to their most recent known addresses or by electronic mail, and complies with Fed. R. Civ. P. 23(h)(1).

4.     Class members and any party from whom payment is sought have been given the opportunity to object in compliance with Fed. R. Civ. P. 23(h)(2).

5.     The amount of the reasonable attorneys' fees awarded to Class Counsel should be based on the percentage of the common fund approach. *Blum v. Stenson,* 465 U.S. 886, 900 n.16, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984); *Smith v. Krispy Kreme Doughnut Corp.,* No. 1:05CV00187, 2007 WL 119157, at *1 (M.D.N.C. Jan. 10, 2007); *DeLoach v. Phillip Morris Cos.,* No. 1:00CV01235, 2003 WL 23094907, at *3 (M.D.N.C. Dec. 19, 2003*).* An attorneys' fees award of $3,938,325, representing 25% of the Settlement Fund after reimbursement of costs, is hereby deemed reasonable, based on awards issued in similar cases. *See, e.g., Smith,* 2007 WL 119157, at *3; *In re ADC Telecomms., Inc. ERISA Litig.,* No. 03-2989 (D. Minn. Oct. 16, 2006); *In re Westar Energy, Inc., ERISA Litig.,* No. 03-4032 (D. Kan. July 27, 2006); *In re HealthSouth Corp. ERISA Litig.,* 2006 WL 2109484 (N.D. Ala. June 29, 2006); *In re CMS Energy ERISA Litig.,* No. 02-72834, 2006 WL 2109499

-2-

(E.D. Mich. June 27, 2006). This award is based on attorneys' fees awards issued in similar cases, the fact that the common fund of $15,900,000 was created for the Class through the efforts of Class Counsel, and the fact that Class Counsel have litigated this case despite having received no compensation for their efforts to date and despite having no guarantees that they would be paid for their time or efforts.

6.    The requested award of attorneys' fees is reasonable and justified, in light of the factors derived from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), and adopted by the Fourth Circuit in *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 (4th Cir.), *cert. denied*, 439 U.S. 934, 99 S. Ct. 329, 58 L. Ed. 2d 330 (1978). The *Barber* factors are as follows: (1) time and labor expended; (2) novelty and difficulty of the questions raised; (3) skill required to properly perform the legal services; (4) attorney's opportunity costs in pressing the litigation; (5) customary fee for like work; (6) attorney's expectation at the outset of litigation; (7) time limitations imposed by the client or circumstances; (8) amount in controversy and results obtained; (9) experience, reputation, and ability of the attorney; (10) undesirability of the case within the legal community in which the suit arose; (11) nature and length of the professional relationship between the attorney and client; and (12) fee awards in similar cases. *In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 786 (E.D.Va. 2001).

7.    The $146,697.89 in litigation costs and expenses incurred by Class Counsel through July 6, 2007, have been adequately documented and were reasonably incurred for

-3-

the benefit of the Class. The Court finds that reimbursement of costs and expenses in this amount is reasonable and justified.

**THE COURT HEREBY ORDERS**:

Class Counsel are hereby awarded attorneys' fees in the amount of $3,938,325 and reimbursement of costs and expenses of $146,697.89, to be paid from the Settlement Fund.

**IT IS SO ORDERED** this 7th day of September 2007.

United States District Judge

-4-

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| RICHARD ANTHONY, *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | Civil Action No. 1:05CV00806 |
| | ) | |
| **vs.** | ) | |
| | ) | |
| KOCH INDUSTRIES, INC., | ) | |
| *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## DECLARATION OF MONA LISA WALLACE, ESQ. IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS

I, Mona Lisa Wallace, co-counsel for the Plaintiffs in this action, declare as follows:

1.     I am one of the attorneys for Plaintiffs in the above-captioned matter.  I make this declaration based on personal knowledge and am competent to testify to the matters set out herein.

**A.   Personal Qualifications.**

2.     I have been a lawyer representing consumers and victims for over 25 years.  During that time, I, and my law firm, Wallace & Graham, P.A., have represented clients in the areas of civil litigation, workers compensation, general and premises liability, insurance coverage, consumer protection, ERISA, medical monitoring, consumer fraud, fair debt collection practices, predatory lending, personal injury, mass and toxic torts and products liability including asbestos, silica, radiation, chemical poisonings, prescription drugs, and other similar occupational and product related claims.  These claims and matters have often involved mass and/or class claims.

1

3.  I attended the University of North Carolina at Chapel Hill for my undergraduate education. I was a National Merit Scholar, and received a Bachelor of Arts Degree with Honors in 1976.

4.  I attended Wake Forest University School of Law for my postgraduate education, and received a Juris Doctor Degree with Honors in 1979.

5.  Since 1979 I have been engaged in the private practice of law in Salisbury, North Carolina, concentrating in civil litigation.

6.  My professional affiliations, licenses and memberships include: North Carolina State Bar; South Carolina State Bar; Texas State Bar; United States District Courts for the Western, Eastern & Middle Districts of North Carolina; United States Supreme Court; South Carolina Supreme Court; United States District Court for the District of South Carolina; and United States Court of Appeals for the Fourth Circuit, among others. Further, I have extensive experience practicing before other judicial and administrative tribunals and forums.

7.  Much of my legal career has been focused on consumer rights issues. I have had a long and active involvement in Trial Lawyers for Public Justice, now known as Public Justice. This organization is the United States' largest public interest law firm. I am the current Treasurer, a member of the Executive Committee, and a member of the Board of Directors of this organization. Public Justice is a national public interest law firm with offices in Washington, D.C. and Oakland, California. A volunteer network of more than 3,000 of the best trial lawyers in the United States, this organization in which I am most actively involved, is dedicated to accepting and litigating cases that involve the public good. I have held various other positions including Public Justice Diversity

2

Committee, Co-Chairman of the Program Development Committee, Case Development Committee, Co-Chairman of the Major Donor/Special Gifts Committee, and North Carolina State Coordinator. I am currently nominated to be Vice President of this organization.

8.    My involvement in Public Justice has included actively working on issues with regard to class actions and class-wide litigation, including active participation in our class action abuse project which is dedicated to preventing the abuse of the class action mechanism by attorneys and parties seeking to enter improper and collusive settlements that do not adequately provide relief to victims and consumers.

9. I have been active with the North Carolina State Bar, including as Former Advisory Member of the Rules of Professional Conduct Review Committee, Former Member of the Public Service and Information Committee, Former Member of the Family Law Committee.    My other Professional Appointments have included appointment to the Wake Forest School of Law Board of Visitors, to the Catawba College Board of Trustees, and to the Hood Theological Seminary Board of Trustees.

10.    I am a member of the North Carolina Academy of Trial Lawyers. My involvement with this organization includes appointment to the Former Executive Committee for Workers' Compensation, to the Legislative Committee, and to the PAC (Political Action Committee) Trustee.

11.    I am a member of the Association of Trial Lawyers of America and the North Carolina Association of Women Attorneys. In 2006, I was presented the NC ATLA's Ebbie Award.

3

12. I am a member of the American Bar Association and the Association of Trial Lawyers of America (Patron). I am also a member of the ABA Task Force on Asbestos within the Tort Trial and Insurance Practice Section.

13. I have been a speaker at Seminars and Conferences on legal issues throughout North Carolina.

14. I have been actively involved in civic and charitable activities including my most recent appointment to the Raoul Wallenberg Committee of the United States, an organization dedicated to educating school children and prisoners about historical heroes.

15. I have successfully brought, litigated, and/or settled numerous multiple-claimant and mass-tort claims, including asbestos claims on behalf of thousands of workers.

**B.   Qualifications of the Law Firm.**

16. Our firm is currently involved in substantial mass and/or class cases involving pension and retiree medical benefits under ERISA. Examples of pending cases in this regard include:

    a. *George, et al. v. Duke Energy Retirement Cash Balance Plan, et al.*, Civ. No. 8:06-CV-373 RBH, DSC (class action claims arising under ERISA in regard to a pension plan); and

    b. *Curtis, et al. v. Alcoa Inc.*, Civ. No. 3:06-CV-448, ED TN (mass and class action claims arising under ERISA in regard to retirement medical benefits).

17. Our firm has special expertise in representing clients in other class action litigation. Other pending class action cases in which our law firm is lead counsel or actively involved co-counsel include:

    a. *Owens and Price v. Automobile Protection Corporation and Sonic Automotive, et al.*, class arbitration before the American Arbitration

4

Association, Consolidated Case No. 30 459 00642 05 (unfair and deceptive finance and sales practices, pending);

b.  *Mills and Owens v. Hendrick Management Corp., et al.*, Union County Superior Court, NC, Civ. No. 04 CVS 2301 (same, pending);

c.  *Dean v. J&B Recoveries*, EDNC, Civ. No. 5:07-cv-00016-BR, FDPCA class action (pending);

d.  *Gunnings v. Internet Cash Enterprise of Asheville*, WDNC, Civ. No. 5:06-cv-00098 (class action against payday/subterfuge lender, pending);

e.  *Murdock v. Rebate Cash Advance*, Iredell County Superior Court, NC, Civ. No. 06-CVS-1865 (same, pending);

f.  *Kucan v. Advance America*, New Hanover County Superior Court, NC, Civ. No. 04-CVS-2860 (class action against payday lender, trial court dismissed on grounds that arbitration clause banned class actions, currently on appeal);

g.  *Hager v. Check into Cash*, New Hanover County Superior Court, NC, Civ. No. 04-CVS-2859 (same);

h.  *McQuillan v. Check n Go*, New Hanover County Superior Court, NC, Civ. No. 04-CVS 2858 (same);

i.  *Knox v. First Southern*, New Hanover County Superior Court, NC, Civ. No. 05-CVS-0445 (same);

j.  *Torrence v. Nationwide Budget*, New Hanover County Superior Court, NC, Civ. No. 05-CVS-0447 (same);

k.  *Pope v. Lake Norman*, WDNC, Civ. No. 3:06-cv-00535 (unfair and deceptive sales and financing practices, class action, pending);

l.  *Roberts v. Folger Automotive, Inc.*, Cabarrus County Superior Court, NC, Civ. No. 07-CVS-320 (same);

m.  *Smith v. GMAC Mortgage Corporation*, WDNC, Civ. No. 5:06-cv-00125 (mortgage servicing, pending); and

n.  *Clark and Carmon v. Alan Vester Auto Group, Inc.*, Vance County Superior Court, Civ. No. 06-CVS-141 (unfair and deceptive sales and financing practices, class action, pending).

5

18. Our firm has special expertise in representing clients in other complex litigation. Other past or pending complex litigation in which our law firm is or was lead counsel or actively involved co-counsel include: mass tort claims against Weyerhaeuser, Alcoa, Duke Energy, Fieldcrest Cannon, and other large corporations; representation of thousands in occupational disease, mass tort, and/or medical monitoring cases and claims; representation of Tennessee industrial workers in a pending medical monitoring class action before the State workers compensation forum; and litigation of numerous complex occupational disease cases in other States with local co-counsel.

19. My law firm is experienced in and capable of administering and processing large groups of claims and ongoing lawsuits, and has settled and continues to settle claims and cases for large groups of employees and retirees on a regular basis.

20. Myself and the attorneys involved in this case have ability and experience in these matters and are reputable and qualified. Our firm has an excellent reputation, particularly in North Carolina where this case was litigated and where the majority of the clients reside. We have not advertised for clients and the firm has expanded solely because of our commitment and devotion to representing our clients zealously.

**C. Time and Labor Expended.**

21. The instant case was a particularly massive and difficult undertaking for me personally and for my firm.

22. For background, the Invista Defendant's facility in Salisbury, North Carolina (formerly known as KoSa, and before that, Hoechst-Celanese) is a very large facility and hundreds of employees, retirees and their families live in the immediate vicinity of our law firm.

6

23.     Our law firm has handled occupational disease, asbestos, and cancer claims for a significant number of these individuals in the past and on an ongoing basis. Many of these individuals suffer from a combination of asbestos-related illness and other medical problems, which made the loss or reduction of health insurance attendant upon the matters which precipitated this case, an especially pressing and stressful issue for these clients.

24.     The demographic of workers most affected by the instant ERISA claims related to loss of health insurance premium subsidies heavily overlapped the demographic of workers most likely to have asbestos-related illness (*i.e.*, workers with 20 to 30 years or more of employment in the Invista/KoSa/Hoechst Celanese facilities, who are now in their fifties). These individuals were understandably very fearful about losing their premium subsidy benefits.

25.     Thus our law firm began receiving literally dozens of calls, walk-ins, and other inquiries from present and former employees of the Invista facility located in Salisbury, North Carolina in June 2004 when the pertinent letter was sent out by Defendant Invista first notifying employees, retirees and plan participants of the change in benefits which was the subject matter of this lawsuit.

26.     We dealt with a heavy volume of client inquiries from the start and throughout this case because our law firm has past or present attorney-client relationships with numerous present and former Invista workers not only at the Salisbury plant, but also at other facilities affected by the change in benefits which was the subject of this lawsuit. We kept several hundred clients in this matter, clients from past or pending asbestos and occupational disease matters, and/or family members, apprised of the

7

ongoing developments in this case. A substantial amount of attorney and staff time and resources was devoted throughout this litigation to dealing with and managing these clients and family members. They often came in and out of the office without appointments and our office policy is not to turn away walk-ins without appointments, but always to see any client who comes by.

27.     After initial research determined the complexity of the ERISA issues involved, I personally began to contact other attorneys with ERISA and employment law expertise in an effort to assemble the team of attorneys which I believed was necessary to adequately prosecute this matter. I initially assigned attorney Richard Huffman, and thereafter attorney John Hughes at our firm, to begin extensive research and to have a series of individual and group meetings with the numerous clients who came to our firm for counsel.

28.     Between June 2004 when we first began receiving inquiries, and September 2005 when we filed suit, we contacted and spoke with attorneys including at various "boutique" ERISA firms across the country, and staff counsel at AARP, Public Justice and other groups, searching for co-counsel. We consulted with the Ferguson Stein firm in Charlotte for its employment law expertise. Due to the risk and complexity of the case, we had difficulty associating special ERISA counsel until we located the firm of Lewis, Feinberg, Lee, Renaker & Jackson, P.C. in San Francisco, California. Telephone and personal meetings with the attorneys from Lewis Feinberg then followed, and our firm continued to work with numerous clients, to extensively research this matter, to obtain and review plan documents, and to draft initial pleadings.

8

29.     The docket reflects the history of the case once filed, to have been zealously litigated and defended, as follows. On September 15, 2005, Class counsel filed the initial Complaint in this matter on behalf of 32 named Plaintiffs. [Docket no. 1].

30.     Also on September 15, 2005, Class counsel filed a motion for preliminary injunction [docket no. 5], and a brief in support of the motion, with attachments. [Docket no. 6].

31.     Defendants began a vigorous defense. On October 5, 2005 they moved for additional time to respond to the complaint and the motion for a preliminary injunction. [Docket no. 7]. This request was contested. [Docket no. 9].

32.     On October 11, 2005, Defendants filed a motion to dismiss and a memorandum in support. [Docket nos. 13-14]. Class counsel filed a brief in opposition with supporting documents. [Docket Nos. 18-19]. Class counsel filed a reply brief in support of the motion for preliminary injunction. [Docket no. 28].

33.     Class counsel prepared for and attended a hearing on the pending motions on November 22, 2005 before Judge Osteen. The Court by Order dated November 25, 2005, denied the motion for preliminary injunction, and held open the motion to dismiss. [Docket no. 29]. Pursuant to the Court's instruction that discovery proceed in an prompt fashion, Class counsel negotiated with defense counsel a proposed scheduling order. [Docket no. 30].

34.     After the lawsuit was filed in September 2005, extensive work on the case continued, including preparing written discovery responses for 32 Plaintiffs, reviewing voluminous documents for those Plaintiffs and for involved non-Plaintiff fact witnesses, assembling and producing those documents, preparing Plaintiffs and non-party witnesses

9

for more than 37 depositions mainly occurring at our offices in Salisbury, North Carolina, in the time period of February through April 2006, and related activities.

35.     The parties contested various discovery initiatives of the opposing parties, leading to motions practice on discovery issues. [Docket nos. 37, 38, 45, 46, 48, 49, 53, 54]. Two of the named Plaintiffs, Mr. Thomas and Mr. Boger, passed away while the case was pending, leading to motions practice with regard to the continuance of their claims and substitution of family members to continue their claims. [*See* Docket nos. 57, 58, 77, 78, 104-05, 108-112, 125, 132-33].

36.     The parties conducted a mediation presided over by John Harkavy as mediator on May 3, 2006, which however was unsuccessful. Our firm worked to meet with and educate the Plaintiffs in anticipation of this mediation, which was held at our firm's offices.

37.     The parties each filed voluminous cross-motions for summary judgment in June 2006 after discovery had proceeded. The parties each filed opposition and reply briefs in due course. [*See* Docket nos. 69-76, 80-81, 86-97, 99-102].

38.     On November 22, 2006, the Court scheduled a settlement conference to occur on December 19, 2006. [Docket no. 119]. The parties submitted position summaries and attended the settlement conference, which was presided over by Magistrate Judge Sharp. The conference continued over a second day on December 20, 2006. The Court ordered the parties to return for continuance of the conference on January 4, 2007. In the interim the parties made certain pretrial filings. [Docket nos. 123, 126].

10

39.     The settlement conference continued on January 4 and 5, 2007.  After lengthy negotiations, a settlement was reached on January 5, 2007.

40.     On March 30, 3007, Class counsel filed a motion to certify a class and brief in support.  [Docket No. 135-36].

41.     On April 11, 2007, the Court entered an Order preliminarily approving the class settlement, conditionally certifying a class, approving the class notice, and scheduling a fairness hearing.  [Docket no. 138].

42.     The above series of filings embraces a period of time from September 2005 through April 2007.

43.     Our law firm held periodic individual and group meetings with named Plaintiffs as well as other retirees who had contacted our firm and were affected by the ongoing events in this case, during the time period noted above.  Our firm also mailed periodic updates to named Plaintiffs and to other firm clients who were potentially affected individuals.  After the first two days of settlement conference negotiations concluded on December 20, 2006, our law firm scheduled meetings with named Plaintiffs to discuss the status of events.  Class counsel retained a consulting expert to assist with determining various settlement-related issues and calculations and with data analysis.  The parties worked to have pertinent data provided and evaluated.  This allowed Class counsel to create various settlement models and tables which work product was used for meetings with the Plaintiffs to evaluate settlement options and prepare for further settlement negotiations.

11

44.     There were, by the undersigned's count, over 50 separate depositions taken in the case. Drafting, discovery and briefing were all voluminous undertakings, particularly given the case had 32 named Plaintiffs as initially postured.

45.     Wallace & Graham has incurred at least 1500 hours in attorney time and 426 hours of time for work of paralegals and law clerks. Applying the firm's attorney rates of between $260 and $495/hour and paralegal and law clerk rates of between $75 and $180/hour yields a lodestar of $662,362. The hourly rates used in this calculation do not include charges for expense items. Expense items are billed separately and such charges are not duplicated in the firm's billing rates.

46.     In addition, our law firm advanced significant unreimbursed expenses in this matter. These expenses are commercially reasonable and are reflected in the books and records of the firm. Our firm's total expenses to date are approximately $40,268.08.

47.     Our firm has included in its estimate no time incurred by 13 other employees who performed work on this case over its approximate three year duration in secretarial and other administrative capacities. These employees included Ashley Hoffner, Connie Brown, Ellen Devine, Krystal Draughn, Dotty Earnhardt, Chasie Beacham, Teresa Faggart, Joanne Everhart, Holly Sheets, Sheelagh Donaldson, Ashley Hoffner, Jay Henderlite and Scott Harrington.

**D.  Benefit Obtained for Plaintiffs and Class Members.**

48.     The class action settlement agreement in this case creates a common fund for the benefit of the class of $15.9 million.

49.     Class counsel have been advised that the settlement has been approved by the Board of Directors of Invista.

12

50.    A deposit of two-thirds of the gross settlement fund ($10.6 million) has been made by Invista into F&M Bank in Salisbury, North Carolina in accordance with the terms of the parties' settlement agreement filed with the Court on March 3, 2007 [docket no. 135-2]. Invista is to deposit the remaining one-third ($5.3 million) within fifteen days of the Court's entry of an order of final approval of the settlement.

51.    In this matter, we obtained substantial benefits for a class of over 1,000 plan participants. The overall settlement fund of $15.9 million the undersigned believes may be the largest class settlement of its kind in North Carolina for an ERISA matter involving retiree medical benefits.

52.    The undersigned promulgated and distributed a clear, easy-to-read class notice noting clearly the proposed class counsel attorney fee award of 25% of the settlement fund amount. The undersigned is not aware of a single objection having been filed as of the deadline for objections of June 15, 2007.

**E.    Risk Attendant Upon the Matter.**

53.    The case involved complex and difficult issues. This may be evidenced by the complexity of the legal arguments made in the briefs that have been filed, and by the filings of notices of supplemental authority reflecting continuing developments in this area of law. [*See* Docket nos. 115, 122, 124]. The complexity of the case and evolving nature of the law required Class counsel to monitor other active ERISA cases during the pendency of this case, and to perform regular searches of Westlaw and PACER so as to monitor ongoing developments in the case law. The unsettled nature of the law increased the risk of the case.

13

54.     The risk to our firm was increased because our firm accepted the case under a contingent fee basis without requiring any retainer, deposit or hourly payment from our clients, at any time, whatsoever. We elected not to charge the clients, even for deposition expenses and other such costs, because many of the clients were undergoing financial hardship for the reasons alleged in the case. Accordingly, our law firm bore a substantial financial and social risk in the event the case had failed. The social risk was significant for me personally and our firm because of the great amount of local publicity that this case attracted and the concerns of the community as a whole for these people.

**F.   Novelty and Difficulty of the Issues.**

55.     The case involved novel and difficult issues of vesting, breach of fiduciary duty, and equitable and monetary relief available under ERISA, as well as issues having to do with affirmative defenses and denials of liability including the effect of certain severance agreements and releases. The parties' briefing of the preliminary injunction, dismissal, and summary judgment motions in this case demonstrates the complexity of the issues involved. The undersigned is of the opinion that certain issues in the case pertaining were issues of first impression in this Circuit.

**G.   Skill Required to Perform the Legal Services.**

56.     My firm has had extensive experience in handling large number of claimants in complex litigation and class action litigation. The issues related to the voluminous plan documents, vesting, and fiduciary duty issues required not only the ERISA expertise of myself but also Mr. Hughes and Mr. Nicholson, who are also experienced in ERISA litigation.

14

57.     Mr. Hughes, who incurred much of the primary work, is an attorney licensed to practice law in North Carolina. He has experience representing consumers in the areas of civil litigation, insurance coverage, consumer protection, predatory lending, ERISA claims, truth in lending, fair debt collection, and complex civil litigation. Mr. Hughes attended the University of North Carolina at Chapel Hill for his undergraduate education. He received a Bachelor of Arts Degree in English in 1986. He attended Wake Forest University School of Law and received a Juris Doctor Degree, cum laude, 1995. Since 1995, he has been engaged in the private practice of law in North Carolina, concentrating in civil litigation. His professional affiliations, licenses and memberships include the North Carolina State Bar, American Bar Association, United States District Courts for the Eastern, Middle and Western Districts of North Carolina, and United States Court of Appeals for the Fourth Circuit.

58.     Mr. Nicholson, who also assisted, is an attorney licensed to practice law in North Carolina and Georgia. He attended Davidson College where he earned his Bachelor of Arts degree, magna cum laude. He obtained his law degree from the University of Virginia. Mr. Nicholson has experience in both individual and class action litigation on a variety of topics, including benefits disputes affecting current and retired employees. He has experience in litigating both administrative claims and court actions under ERISA, and litigation and compliance experience on the subjects of consumer and secured lending.

59.     Our firm has not only skilled attorneys and paralegals, but also an intake department and a medical department, whose organization and experience also were beneficial.

15

**H. Opportunity Costs in Handling the Litigation.**

60. Mr. Hughes of our office was precluded from taking on certain other matters as a result of the time commitments of this case.

61. Over the course of this litigation, our firm investigated certain other matters that we chose not to handle because of the time, resources, and commitment necessary for this matter.

**I. Time Limitations Imposed by the Circumstances.**

62. The circumstances dictated that this case be aggressively litigated because of the ongoing hardship suffered by the clients and other plan participants. Accordingly the Plaintiffs sought a preliminary injunction as the Court is aware. The Court set a compressed discovery and deposition schedule and dozens of depositions occurred between February and April 2006. The combination of 30-plus Plaintiffs, a compressed discovery schedule, and the complexity of the issues, meant that attorney and paralegal resources were fairly substantially engaged over the course of the case.

**J. The Undesirability of the Case.**

63. My attorneys initially advised against our firm taking the case. Another local firm rejected it. I decided to take on the case anyway, because I felt that, without our involvement, those affected would have no recourse. As discussed above, the undersigned was required to engage in extensive work simply in order to locate other qualified ERISA-specialized co-counsel willing and able to become involved in the case. The undersigned is not aware of any indication other law firms viewed the case as economically and logistically attractive.

16

### K. Promulgation of Class Notice.

64.     In accordance with the Court's Order of April 11, 2007, Class counsel worked to assemble a list of class members and accurate address and identification information and data necessary to prepare data sheets to send with the Class Notice to each class member so as to advise them of their key data as obtained by Class counsel from Defendants and Class counsel's own investigation and allow for corrections of data pertinent to final settlement share allocations.

65.     In accordance with paragraphs seven and nine of the Court's Order dated April 11, 2007, our firm prepared and sent out a mass mailing of the Class Notices and data sheets to all class members, by first class mail, postage prepaid, to the last known address of all settlement class members, which mailing occurred within 14 days of the date of the Order.

66.     In its capacity as Settlement Administrator, our firm has administered inquiries from class members and has worked with co-counsel to address requested changes of data on data sheets, received from class members. Our firm working with co-counsel has spent substantial time and effort to ensure that questions from potential class members are answered in a timely and accurate manner. Our firm has made available its 1-800 number for questions and inquiries from potential class members. Our firm sent out a large-type, easy-to-read class notice.

67.     To date, no individual to the undersigned's knowledge has filed an objection to the proposed class settlement. To the contrary, the undersigned has been told by many potential class members personally that they support and are grateful for the settlement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of July, 2007, in Salisbury, North Carolina.

<u>S/Mona Lisa Wallace</u>
Mona Lisa Wallace, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

RICHARD ANTHONY et al.,    )
                            )
      Plaintiffs,      )
                            )
                            )     Case No. 1:05CV0086
v.                   )
                            )
KOCH INDUSTRIES, INC. et al., )
                            )
      Defendants.     )

## DECLARATION OF GARY V. MAUNEY

I, Gary V. Mauney, make the following Declaration, under penalty of perjury:

1.    I am a licensed attorney in the State of North Carolina. I am over the age of eighteen (18), and am otherwise competent to make this Declaration. I am a partner with the law firm of Lewis & Roberts, PLLC, located in Charlotte, North Carolina. I am admitted to practice before the Eastern, Middle and Western District Courts of North Carolina, before the United States Court of Appeals for the Fourth Circuit, and before the United States Supreme Court. Prior to my work in private practice, I served as a law clerk to the Hons. Jack Cozort and Donald L. Smith of the North Carolina Court of Appeals.

2.    I have been involved in civil litigation in the Eastern, Middle and Western Districts of North Carolina since the 1990s. A substantial portion of my practice centers upon shareholder, derivative and class actions. I have, along with my current or former law firms, been appointed lead or co-class counsel in concluded matters such as *Smith v. Krispy Kreme Doughnut Corp., et al.*, Case No. 1:05 CV 00187(MDNC) (ERISA class action); *Stevens v. Mutual of Omaha Insurance Co.*, Case No. 04 CVS 2615 (N.C. Sup. Ct.) (class action involving alleged overpayment of medicare

supplement healthcare insurance); and *Bosco v. PhyAmerica Physician Group, Inc., et al.*, Case No. 1:00 CV 00901 (MDNC) (shareholder class action). I am currently prosecuting other putative class actions, such as *Eberdt, et al. v. Quellos, et al.*, Case No. 1:06CV820 (MDNC) (abusive tax shelter and investment litigation); *Horner v. Blue Cross & Blue Shield of North Carolina*, Case No. 5:04 CV 081 (WDNC) (billing practice dispute between health insurer and physicians, currently pending in the multi-district litigation styled *In Re: Managed Care Litigation*, MDL 1334 (S.D. Fla.)). As a result of the foregoing, I am familiar with the practice and conduct of class actions in general in the state of North Carolina, and I am specifically familiar with the issues that arise in ERISA litigation.

3.     Plaintiffs' counsel has asked me to provide a Declaration evaluating their request to recover attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1). I am not counsel to any party in the above-captioned litigation, nor have I been previously involved in this litigation. I have no personal interest in the outcome of this action.

4.     My practice centers, almost exclusively, on complex civil litigation, including trial and appellate work. My practice focuses upon and includes insurance, investment and securities-oriented litigation. As my work in the *Krispy Kreme* matter reflects, I am well aware of the difficulties inherent to the prosecution of an ERISA case. Having litigated to conclusion cases involving auditor malpractice, securities fraud, ERISA-related matters, and other similar business and corporate litigation, I am aware of the work and skill required to successfully prosecute such cases.

5.     I am also familiar with the practical economics of prosecuting complex civil and class action matters, such as ERISA litigation. As the reported appellate cases reflect, there is an evolving

2

federal body of law concerning ERISA. Almost irrespective of the merits, ERISA cases present a substantial risk of failure. This is so because the nature of the work is complicated, disparate results appear in decisions decided by various federal courts, and because ERISA defendants typically have substantial resources and high quality legal representation. To account for the incumbent risks, ERISA plaintiffs' counsel must perform significant due diligence prior to ever filing suit. And once an ERISA suit is initiated, substantial legal research and analysis, and first-rate litigation skills, are required to successfully prosecute the action.

6. Most ERISA cases are also brought on a contingent fee basis. This is so because most potential ERISA plaintiffs do not have the means to retain appropriately qualified counsel at customary hourly legal billing rates for such work. Hence, when a law firm takes an ERISA case on contingency, the firm must be prepared to invest substantial sources toward the successful prosecution of the case. The complexity of the work, the difficulty of winning, and the uncertain risks limit the number of firms in North Carolina (or elsewhere) that can or would assume the responsibility of taking on an ERISA case such as the one at hand. It would be even more difficult to find a law firm that would pursue the type of plan modification or plan termination issues involved in this action. But for the possibility of court-awarded fees, in an amount sufficient to accommodate the risks and resource commitments inherent to such litigation, most prospective ERISA claimants would be unable to obtain any legal counsel whatsoever.

7. My current hourly rate for representation in litigation on a non-contingent fee basis is $315.00 per hour. I believe my billing rates for such work are in the mainstream for Charlotte-based attorneys with qualifications similar to mine. I am generally familiar with the hourly rates charged by lawyers in Charlotte for business or corporate litigation, as well as in other metropolitan

3

areas in the southeastern United States similar to Charlotte. In Charlotte, I believe the standard market rate for qualified and experienced ERISA counsel would exceed $450.00 per hour.

8.    . On a professional level, I am very familiar with the work of Mona Wallace and her law firm, Wallace & Graham, P.A. Mona Wallace and her law firm have a first-rate track record representing plaintiffs in class actions and civil litigation in general. Very few North Carolina law firms have the class action experience and reputation, and resources, of Wallace & Graham. Mona Wallace and her firm are always well prepared, are exceedingly capable lawyers, and are excellent advocates for their clients.

9.    I have reviewed the attorney fee rates requested by Mona Wallace and the attorneys at her firm. Based on my knowledge of attorney fee rates in Charlotte and other similar metropolitan areas in North Carolina, and the customary prevailing attorney hourly billing rates charged in ERISA matters, and in similar litigation, and my familiarity with standard contingent fee agreements between plaintiffs and their counsel in this region, it is my opinion that the attorney fee rates requested in this case are reasonable. Specifically, and for example, if Mona Wallace was retained by a client with sufficient means, in an ERISA matter, a fair and reasonable market rate for her legal services would be $450.00 per hour, or more. The same considerations apply for the rates requested by the other lawyers at Wallace & Graham based on their experience and qualifications.

[THIS SPACE LEFT INTENTIONALLY BLANK]

4

Further this declarant sayeth not, this 5th day of July, 2007. The foregoing Declaration has been made under the pains and penalties of perjury.

_____
Gary V. Mauney
Lewis & Roberts, PLLC
5960 Fairview Road, Suite 102
Charlotte, NC 28210
Telephone: (704) 347-8990
Facsimile: (704) 347-8929
Email: garymauney@lewis-roberts.com

5